**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John F. GIBSON, Defendant-Appellant.**

**No. 80–5280.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 17, 1981.

Decided April 20, 1982.

Rehearing and Rehearing En Banc Denied Aug. 3, 1982.

---

Anthony M. Cardinale, F. Lee Bailey, Boston, Mass., for defendant-appellant.

James C. Cissell, U. S. Atty., Patrick J. Hanley, Asst. U. S. Atty., Cincinnati, Ohio, for plaintiff-appellee.

Before MERRITT and MARTIN, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

This is a direct criminal appeal from embezzlement and conspiracy convictions. John F. Gibson was found guilty by a jury of misappropriating union property in violation of 29 U.S.C. § 501(c).[1] Gibson is the General Secretary-Treasurer of the Hotel and Restaurant Employees' and Bartenders' International Union ("The International"). In March, 1979, a Grand Jury sitting in the Southern District of Ohio returned an 18-count indictment against Gibson, alleging numerous acts of embezzlement from the Union. The counts that concern us charged that Gibson has misused the Union's jet airplane for personal travel. Gibson was also charged with conspiring with James Stamos and Herbert Schiffman to misuse the Union jet for a fishing trip.[2]

After a jury trial on all but two of the original counts, Gibson was convicted of one count of overstating unreimbursed employee business expenses on his tax returns. The jury acquitted Gibson of another tax count; one unauthorized travel count; and all unauthorized salary counts. The jury was unable to reach verdicts on six other counts. Accordingly, the trial judge declared a partial mistrial.

Gibson was retried in May, 1980. He was convicted of misusing the Union jet for pleasure trips to Gaspe, Canada and Sacramento, California. He was also found guilty of conspiracy. The jury acquitted Gibson of the other charges. The District Court sentenced Gibson to serve three concurrent four-month terms.

Gibson now appeals, raising four contentions. First, he challenges the sufficiency of the evidence supporting the guilty verdicts. Second, he contends that he was prejudiced by an erroneous evidentiary ruling excluding certain testimony as hearsay.

---

1. 29 U.S.C. § 501(c) provides that:

    Any person who embezzles, steals, or unlawfully and wilfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

2. 18 U.S.C. § 371.

Third, Gibson argues that the District Court abused its discretion by prohibiting a defense witness from testifying as a sanction because the witness violated a sequestration order. Finally, Gibson complains of prosecutorial misconduct during closing argument. For the following reasons we affirm.

## I. SUFFICIENCY OF THE EVIDENCE

Gibson contends that his Rule 29 motions for a judgment of acquittal were improperly denied. He argues that the government's proof of the personal nature of the Gaspe and Sacramento trips was circumstantial and insufficient to warrant submission to the jury.

To establish a violation of section 501(c) the government must prove that a defendant embezzled, stole, or unlawfully or wilfully abstracted or converted to his own or another's use, the funds or property of a labor union. *United States v. Dibrizzi*, 393 F.2d 642 (2d Cir. 1968); *United States v. Harmon*, 339 F.2d 354 (6th Cir. 1964), *cert. denied*, 380 U.S. 944, 85 S.Ct. 1025, 13 L.Ed.2d 963 (1965). The language of section 501(c) imposes the "broadest possible fiduciary duty upon union officers." *United States v. Bane*, 583 F.2d 832 (6th Cir. 1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979). In enacting the statute, Congress created a new criminal penalty to prevent the following evil:

[O]fficers and other union representatives may not act adversely to their organization or to the members as a group or acquire a personal interest which is contrary to the interests of the organization. Being trustees the officers must subvert their own personal interests to the lawful mandates and orders of the organization.

*United States v. Goad*, 490 F.2d 1158, 1162 (8th Cir.), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974), *quoting John-son v. Nelson*, 325 F.2d 646, 650 (8th Cir. 1963).

■■■ Section 501(c) cases can be brought on either of two theories: one theory involves unauthorized expenditures or use of property, and the other involves authorized expenditures or use of property for a wrongful purpose. Gibson was prosecuted under the latter theory.[3] The essential elements of an authorized use case are: (1) proof that the defendant had a fraudulent intent to deprive the Union of its funds; and (2) proof that the defendant lacked a good faith belief that the expenditure or use was for the legitimate benefit of the Union. *United States v. Bane*, 583 F.2d at 836.[4] *See also United States v. Santiago*, 528 F.2d 1130 (2d Cir.), *cert. denied*, 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *United States v. Boyle*, 482 F.2d 755 (D.C.Cir.), *cert. denied*, 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483 (1973). *See generally United States v. Marolda*, 615 F.2d 867 (9th Cir. 1980), *later app.*, 648 F.2d 623 (1981).

The instructions given by the District Court have not been challenged on appeal. The Court correctly defined the essential elements of the offense for the jury as follows:

To constitute a violation of 29 United States Code Section 501(c) where the expenditure of union funds is not authorized, there are four essential elements which must be proved beyond a reasonable doubt: One, the embezzlement, theft or unlawful and willful abstraction or conversion to his own use or the use of another of; two, the moneys, funds or other assets of; three, a labor organization of which; four, the defendant is an officer or employee.

Where the expenditure of union funds was authorized, the United States must in addition prove beyond a reasonable

---

3. It is clear that authorization was not a defense available to Gibson. The record shows that Gibson was one of only two people in the Union who could authorize the jet's use. The only other person with similar authority was International President Edward Hanley.

4. The parties stipulated that the remaining elements were satisfied: (1) "the moneys, funds, securities, property, or other assets (2) of a labor organization (3) of which (the defendant) is an officer. . . ."

doubt: First, a fraudulent intent by the defendant to deprive the union of its funds; and second, a lack of good faith belief by the defendant that the expenditure was for the legitimate benefit of the union.

The District Court also instructed the jury that, in considering the Sacramento and Gaspe travel counts, they must decide whether the primary purpose of these trips was to further Union interests, or Gibson's personal interests:

If the primary purpose was to conduct union business the fact that the defendant obtained personal enjoyment does not make the expenditure of funds or use of the union property a violation of the statute.

On the other hand, if the primary purpose of a trip was to provide enjoyment or social entertainment for the defendant, the fact that union business was incidentally transacted does not excuse a violation of the statute.

Your determination of the primary purpose of each trip in question must be based upon the evidence, these instructions and your own knowledge and experience.

In connection with the Gaspe trip, you may take into consideration the fact that the defendant paid part of the expenses. The burden is upon the United States to prove beyond a reasonable doubt that the primary purpose of each trip was the enjoyment and social entertainment of the defendant.

■ Before reviewing the government's evidence to determine whether the prosecution met its burden, we briefly state the rules governing our inquiry. In deciding whether evidence is sufficient to withstand a motion for an acquittal, we must view the evidence and all reasonable inferences in the light most favorable to the government. *E.g. United States v. Collon,* 426 F.2d 939 (6th Cir. 1970). If the evidence is such that we conclude that a reasonable mind might fairly find guilt beyond a reasonable doubt, the issue is one for the jury. If we conclude that a reasonable

doubt is raised, we must reverse a denial of an acquittal motion. *Id.* We cannot weigh the evidence or judge credibility independently in deciding whether the District Court erred in submitting the case to the jury. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1940) *cited in United States v. Nell,* 526 F.2d 1223 (5th Cir. 1976). Applying these principles to the record before us, we hold that the court below correctly refused to direct a verdict in Gibson's favor. We turn to describe the evidence adduced by the government, which amply supports the jury's verdict.

A. Sacramento Trip.

■ Gibson was charged with misusing the Union's airplane to transport Helene Hallett, an intimate friend, from Oakland, California to Sacramento for a one-night dinner date in November, 1975. No one disputes the facts that Hallett travelled to Sacramento in the Union plane, that she dined alone with Gibson that evening, that she spent the night with him, and that she returned to Oakland the next morning in the Union plane. Rather, the disputed issue is whether Hallett's trip was for union or personal purposes.

The government relied exclusively on Hallett to show that Gibson's purpose in bringing her to Sacramento was strictly personal. Hallett testified that she and Gibson had dated occasionally and had developed an intimate relationship before her trip. Sometime in November, Gibson called Hallett and asked her to accompany him on a three-day trip to visit three local unions and to attend their installation dinners. Hallett declined the invitation at first because she was unable to leave her job as acting office manager of Local 28, a branch of Gibson's International. Apparently Hallett's supervisor, Ray Lane, was not in town at the time. Gibson then invited her to join him for dinner for one evening in Sacramento. Hallett told Gibson that she would ask her superior for permission to leave the office early when he called from out of town. After Ray Lane gave his consent, Hallett agreed to go when Gibson called her

again. Gibson told her that he would arrange to send the Union plane to meet her.

In describing the events of the Sacramento evening, Hallett stated that the trip was purely social, both in design and execution. She testified that although she and Gibson had a few drinks before dinner with several Union officials, including International President Hanley, no one discussed union business with her. She and Gibson eventually left the union group and dined by themselves in a restaurant. Hallett described their dinner conversation as "social" and "general." According to Hallett, her relationship with Gibson was "strictly social." She also testified that she did not discuss union business that night, although she gladly would have volunteered to Gibson information about Local 28's problems. After dinner, Hallett and Gibson retired to Gibson's hotel and spent the night together. The following morning they ate breakfast at the hotel and drove to the airport.

On cross-examination, defense counsel probed the fact that Local 28 had serious problems involving dishonest activities of Ray Lane, Hallett's supervisor. Lane was reportedly falsifying union minutes with Hallett's knowledge. According to the defense, International President Hanley had ordered Hallett's trip to Sacramento to interrogate her subtly about Lane and the Local's problems. Hallett admitted that initially she had not complained about Lane's activities to anyone in the Union. Eventually she did complain and gave incriminating information to Jack Kenneally, an International official. Steve Revilak, another officer of the Local, also confided in Kenneally and other International officials about Lane's conduct. Hallett was eventually fired for signing a petition to remove Lane from office. Although defense counsel attempted to establish that Hallett hid her relationship with Gibson from Lane, Hallett testified that she asked Lane for permission to fly to Sacramento to see Gibson. When asked whether she had discussed any union business during her trip, she replied that Union man Medeiros had "pumped" her for information about her Local on the journey to Oakland.

On redirect, Hallett testified that neither Gibson nor any other official questioned her about Ray Lane and Local 28's administrative internal problems. Hallett recalled that only Medeiros had questioned her about her Local. However, his questions involved an impending merger between Local 28 and another Local. Hallett stated that she could not give Medeiros the information he sought on the merger. Finally, Hallett reiterated that Medeiros did not inquire about Ray Lane's conduct or Local 28's internal problems.

We must measure the denial of Gibson's Rule 29(a) motion against Hallett's testimony, the government's case in chief on the Sacramento count. If the jury believed Hallett's testimony, as they apparently did, the evidence established beyond doubt that the purpose of her trip was to provide an amusing evening for Gibson at Union expense. Admittedly the government's case was circumstantial, as is any case where purpose and intent are essential elements of a crime. However, we find no merit in Gibson's assertion that Hallett's testimony, standing alone, was insufficient to send the Sacramento count to the jury.

We also find no merit in Gibson's assertion that his Rule 29(c) motion for acquittal should have been granted. From our review of the record, we conclude that the evidence strongly supports the jury's finding that Gibson sent the plane for Hallett with pleasure rather than business in mind. The defense relied on International President Hanley to discredit Hallett's assertions about the purpose of her trip. According to Hanley, he suggested that Gibson fly her to Sacramento for questioning about Lane's misconduct. He stated that he told Gibson: "Why don't you get her over here and—She seems to be the kind that wants to talk about it, and get her over here and see if we can find something out." On the stand Hanley recounted the Local's problems at length. When asked on cross-examination why he never spoke to Hallett about these problems in Sacramento, Hanley replied that he did not question her himself because

he might ultimately review any charges brought against Lane. Hanley also testified that he ordered a special audit of Local 28 as a direct result of Hallett's trip. This audit revealed that Lane had bought a life insurance policy for himself without authorization, and that the Local's finances were askew. The government cross-examined Hanley extensively on this issue, asking him to explain why his earlier testimony and correspondence with Lane indicated that he had discovered the life insurance problem in October, one month before he supposedly ordered the special audit of Local 28. Hanley could not explain the discrepancy in dates. He also could not explain why Steve Revilak, a Local 28 officer who had openly complained about Lane and the Local's affairs, was not invited along to Sacramento for fact-finding.

Viewing the evidence and all possible inferences in the light most favorable to the prosecution, we are satisfied that the evidence was sufficient to establish guilt beyond a reasonable doubt.

B. Gaspe Trip

Gibson contends that the government also failed to prove beyond doubt that the purpose of Gibson's trip to Gaspe, Canada, a remote fishing resort, was personal rather than official. Viewing the following evidence in the light most favorable to the government, we reject this contention as well.

No one disputes that Gibson and two Union officials, James Stamos and Herbert Schiffman [5] travelled in the Union plane to Gaspe, Canada for the last weekend in June, 1975. Gaspe is a resort in northern Quebec famous for excellent salmon fishing. The sole dispute is whether the government's evidence established that the trip was a social fishing jaunt, planned as such in advance by three old friends.

The prosecution called several witnesses to establish that the three men went to Gaspe only to fish for salmon and to relax. First the government called Nick Petri, Administrative Assistant to the General Secretary-Treasurer, who is responsible for paying Gibson's bills. Petri routinely kept a monthly memorandum of Gibson's travels as a record of Gibson's whereabouts. Petri had no actual knowledge whether any particular trip was personal or official, nor was he in a position to monitor whether Gibson conducted business on a particular trip. Petri stated that he always assumed that Gibson was on Union business whenever he travelled on the Union plane. Petri routinely reviewed all bills submitted by hotels and restaurants on Gibson's behalf. If Petri thought the expenses were proper, he would pay the various establishments that submitted vouchers. Gibson had an absolute right to charge the Union for all hotel and meal expenses incurred during Union business trips. According to Petri, Gibson's travel memorandum for June, 1975 showed that he was in Montreal, Canada on the last four days of the month. Expense sheets for the Union's pilots and for James Stamos showed that these men were in Gaspe, Canada from June 27 through June 30, 1975.

Next, the government called Lawrence Maloney, the owner of the small lodge in Gaspe in which the three stayed that weekend. Maloney testified that he and Stamos lunched together in April, 1975, at which time the two discussed salmon fishing in Gaspe. Based on his luncheon conversation with Stamos, Maloney began to make preparations for a salmon fishing weekend at his lodge in Gaspe. He opened the lodge for the occasion, rented two salmon rivers and guides, purchased food supplies and hired a staff of four. Maloney testified that he understood that the trip was planned as a salmon expedition, based on his April conversation with Stamos. Accordingly, he reserved two entire salmon rivers. Maloney further stated that the best time to fish for salmon is between June 7 and mid-July.

Maloney was on hand to greet the three men when they arrived in Gaspe. Gibson

---

**5.** Both were indicted as co-conspirators. At the time of Gibson's trial, Stamos had not yet been tried for charges stemming from the Gaspe trip.

was the only one who brought his own fishing gear, most of which was unsuitable for salmon fishing except for a fly.rod. Maloney arranged for proper fishing gear for Gibson and the others. According to Maloney, fishing was poor that year because the rivers were extremely low. Gibson nevertheless attempted to fish every day, although Stamos and Schiffman, less experienced and enthusiastic than Gibson, gave up in apparent frustration and played golf. Maloney recounted that on the day after the group arrived, he drove all three men to the airstrip where they met three ladies and a man named Cretier. The group returned to the lodge and had drinks and dinner together. Although Maloney ate and fished separately from the union group, and thus was not with Gibson the entire weekend, Maloney testified that when Gibson was in his presence he never heard the three discuss union business. Finally, Maloney testified that Gibson, Stamos, and Schiffman each paid him in cash for their hotel, bar, and fishing expenses, after some dispute about the cost of renting the rivers and guides.

Gary Garavaglia, one of the Union's pilots, took the stand. The government called this witness to establish the personal nature of the trip. According to Garavaglia, Gibson ordered him to fly to Quebec City on Saturday morning to pick up several passengers and bring them back to Gaspe. In Quebec City, two women wearing "evening" clothes boarded the plane along with another woman dressed casually and an unidentified man. The two ladies left the next day after an apparent argument with Gibson, Stamos, and Schiffman. Although the pilot did not spend much time with Gibson that weekend, he did observe Gibson and the others fishing. He also observed what he described as "social activity." The government submitted that the pilot's inference was competent, based on his long association with Gibson and the events he observed in Gaspe.

Viewing this evidence and all reasonable inferences in the government's favor, we conclude that a reasonable mind could fairly find Gibson guilty beyond a reasonable doubt of misusing the Union plane for a personal fishing trip to Gaspe. In our view the government presented ample evidence in its case in chief to send these counts to the jury. The evidence clearly invites and permits the inference that Gibson, Stamos and Schiffman planned a weekend fishing trip together at the height of the salmon season. Gibson is an avid fisherman and the three are old friends. The evidence supports the government's theory that Gibson tried to conceal the fact that he took the plane to Gaspe: Petri's records show that Gibson was in Montreal from June 27 to June 30. Furthermore, Gibson paid his own lodging and fishing expenses in cash, and he never sought reimbursement from the Union, although he had a right to be reimbursed for all business expenses. If the jury credited the testimony of Petri, Maloney and Garavaglia, the evidence was sufficient to establish that Gibson consciously misused the Union plane for his personal benefit, and that he planned this misuse with his two friends.

Our assessment of the evidence is not altered by the testimony of the defense witnesses. Gibson called Hanley and Stamos, a co-conspirator and President of the Local in Montreal, to describe the official nature of the Gaspe trip. Hanley stated that the International was then facing organizational problems in Canada due to the Separatist movement in Quebec which gathered strength in the spring of 1975. In January of that year, the International's Executive Board discussed in great detail the Canadian problem at a meeting attended by Hanley, Gibson, and Stamos. Hanley testified that he asked Gibson to travel to Quebec to investigate this and related union problems. Finally, Hanley testified that he "received some information" from Gibson after the Gaspe trip.

Stamos corroborated Hanley's testimony about the topic of the January meeting. According to Stamos' version of history, Gibson called him in May, 1975 to say that he was "authorized" to travel to Canada to talk about the Union's problems. Stamos then notified Maloney to open his lodge in

Gaspe. Stamos testified that he and Gibson discussed the Quebec situation on the night of arrival, and that the three men spent approximately "sixty to sixty-five" percent of the weekend discussing union matters. Gibson ordered Stamos to bring a man named Cretier to Gaspe. Cretier was the Union's business representative in Quebec City. Accordingly, Stamos called Cretier from the lodge on Saturday morning and invited him for the weekend. Later that day Cretier arrived on the union plane. All three men picked him up at the airstrip. According to Stamos, Gibson "got mad" when he saw that Cretier had brought two extra women with him. Gibson reportedly said "who are these people" and ordered the women to leave on a commercial flight the next morning. On cross-examination Stamos was unable to explain why all three men paid the airfare to send the women back to Quebec City, if the three had not in fact known in advance that the women were coming. The prosecution reminded Stamos that he had testified at Gibson's first trial that Cretier had brought the women along for "entertainment." When the prosecution asked why Gaspe had been chosen for a business meeting, Stamos responded that Gibson came to Gaspe to "get closer" to the Quebec problem. However, Stamos also stated that Gibson could not travel to Quebec City or Montreal, where the union actually operated because Gibson had to be insulated from the "source of the trouble." Stamos was extremely vague when cross-examined about specific topics he, Gibson, and Schiffman discussed at Gaspe. He mentioned that they discussed the provisions of certain collective bargaining agreements in detail, but he could not identify them. Furthermore, Stamos was not able to explain why not one of the three brought along any of the documents or working papers that Stamos claims they discussed.

We conclude that the government's evidence was not only sufficient to warrant submission to the jury, but that it was also sufficient to establish Gibson's guilt beyond a reasonable doubt. Direct proof of each element of a section 501(c) violation is not necessary to convict. *United States v. Vitale*, 489 F.2d 1367 (6th Cir. 1974). The jury was entitled to draw adverse inferences from the testimony of the government's witnesses and to discredit the testimony of Hanley and Stamos, a highly interested witness. On balance, the evidence substantially supports the jury's finding of guilt beyond a reasonable doubt.

## II. HEARSAY EXCLUSION

Gibson contends that he was prejudiced by an evidentiary ruling excluding as hearsay a defense witness' proffered testimony that he heard Hanley say to Gibson: "get her over here and let's find out what's going on." The defense called Anthony Smieca, Secretary-Treasurer of the Palm Springs Local, who travelled with Hanley and Gibson in 1975 when they toured Bay Area Locals. Defense counsel asked Smieca to recount any discussions he overheard between Gibson and Hanley about Local 28. The prosecution objected that any answer would be inadmissible hearsay. At side bar the defense counsel made an offer of proof that the woman Hanley's utterance referred to was Hallett. The District Court sustained the objection as inadmissible hearsay.

Gibson now argues that the exclusion of Smieca's statement was reversible error because: (1) the utterance was not hearsay because it was not offered for the truth of its contents; (2) the statement would have corroborated Hanley's earlier testimony to the same effect; and (3) the statement was relevant to Gibson's state of mind at the time he invited Hallett to journey to Sacramento. We agree with Gibson that Smieca's statement should not have been excluded as hearsay. However, we conclude that the improper exclusion was harmless error.

We have no doubt that the statement should have been received. First, the hearsay rule bans in-court repetition of extra-judicial utterances only when they are offered to prove the truth or falsity of their contents. The rule does not apply to statements offered merely to show that they

were made. *E.g. United States v. Miriana,* 422 F.2d 150, 153 (6th Cir.), *cert. denied,* 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); *United States v. Press,* 336 F.2d 1003 (2d Cir. 1964), *cert. denied,* 379 U.S. 965, 85 S.Ct. 658, 13 L.Ed.2d 559 (1965). Smieca's proffered statement was not hearsay under Federal Rule of Evidence 801(c): it was not offered to show that the substance of Hanley's utterance was either true or false. Indeed, a suggestion or an order is not subject to verification at all because such utterances do not assert facts. Gibson offered the utterance solely for the fact that it was made by Hanley and heard by Gibson. Smieca's account of Hanley's suggestion was testimony about a circumstantial utterance, which could have been received properly on the issue of Gibson's belief or state of mind in consequence of the utterance. *See United States v. Herrera,* 600 F.2d 502 (5th Cir. 1979); *United States v. Rubin,* 591 F.2d 278 (5th Cir.), *cert. denied,* 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979); *United States v. Wilson,* 532 F.2d 641 (8th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976); *United States v. Chason,* 451 F.2d 301 (2d Cir. 1971), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479 (1972). *See also,* VI Wigmore on Evidence § 1789 at 235 (3rd ed. 1940); McCormick on Evidence § 225 at 460–463 (1954 ed.).

■ We conclude that the District Court's error was harmless beyond a reasonable doubt and that it did not affect Gibson's substantial rights. First, Smieca's testimony would not have provided the jury with any new information about Gibson's purpose or belief in transporting Hallett to Sacramento. Hanley himself had already testified, without objection, that he suggested to Gibson that he bring Hallett to Sacramento. Evidence bearing on Gibson's good faith belief that Hallett's trip would serve a legitimate purpose was already before the jury in the form of the declarant's own testimony. Thus, the jury had ample opportunity to draw the inference that Hanley and Gibson discussed Hallett's potential as an informant. Therefore, the greatest evidentiary value Smieca's version

could have secured for the defense was corroboration of Hanley's previous testimony that he had in fact made such a suggestion to Gibson. In short, Smieca's testimony had only minor "incremental probity." *United States v. Mock,* 640 F.2d 629 (5th Cir. 1981). Smieca's statement, in itself would not have added a new dimension to the issue of Gibson's good faith. We conclude that had the jury heard Smieca's statement, its verdict would not have differed. *See United States v. Chason,* 451 F.2d 301 (2d Cir. 1971), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479 (1972).

■ Second, we reject Gibson's argument that he was prejudiced because he was denied the opportunity to bolster Hanley's credibility. It is always within the discretion of the trial judge to deny a party the opportunity to present cumulative evidence bearing solely on credibility. *United States v. Dennis,* 625 F.2d 782 (8th Cir. 1980); *United States v. Medical Therapy Sciences, Inc.,* 583 F.2d 36, 41 n.6 (2d Cir. 1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979). *See also United States v. Hoffa,* 349 F.2d 20 (6th Cir. 1965), *aff'd,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Boeing Airplane Co. v. O'Malley,* 329 F.2d 585 (8th Cir. 1964); *Harvey v. United States,* 23 F.2d 561 (2d Cir. 1928). Furthermore, Hanley was not impeached on cross-examination about whether he had in fact made such an utterance to Gibson, nor did the government directly or impliedly suggest that Hanley's testimony was a recent fabrication. Therefore Smieca's statement was not essential to rehabilitate Hanley. Hanley's credibility would not have been bolstered by mere repetition. Repetition simply does not ensure veracity:

When the witness has merely testified on direct examination, without any impeachment, proof of consistent statements is unnecessary and valueless. The witness is not helped by it; *for, even if it is an improbable or untrustworthy story, it is not made more probable or more trustworthy by any number of repetitions of*

*it.* Such evidence would ordinarily be cumbersome to the trial and is ordinarily rejected.

*United States v. Navarro-Varelas*, 541 F.2d 1331, 1334 (9th Cir. 1976), *cert. denied*, 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977) (emphasis added, citations omitted). *See also United States v. Dennis*, 625 F.2d at 797; *Coltrane v. United States*, 418 F.2d 1131 (D.C.Cir.1969); IV Wigmore on Evidence § 1126 (3rd ed. 1940).

Because Smieca's testimony was cumulative and repetitious, and would therefore not have influenced the jury's verdict, its exclusion was harmless error beyond a reasonable doubt.

## III. SEQUESTRATION ORDER

We reject Gibson's third contention that the District Court erroneously denied his motion for a new trial based on the court's refusal to allow a witness to testify who had remained in court despite a sequestration order. The defense tried to establish through Hanley's testimony that Hallett's trip had been the catalyst for a special internal audit of Local 28. According to Hanley, the audit commenced after November 11, 1975. In earlier testimony, however, Hanley had stated that the post-Sacramento audit revealed various fiscal irregularities, including the unauthorized life insurance policy Ray Lane had bought for himself. To corroborate his testimony, Hanley produced a letter to Lane written in October, 1975, denying authorization for the policy and pointing out various irregularities. On cross-examination, the prosecution seized upon the apparent discrepancy in dates. Hanley failed to state that the audit mentioned in the October letter was a routine audit, but that another special audit was made after November.

The defense maintains that Hanley was merely confused about the number and dates of the audits because he was largely unfamiliar with audit procedures. To correct Hanley's testimony, defense counsel attempted to call Joseph Clair to the stand. Clair had been assigned to audit Local 28 to replace an auditor who had recently died.

The District Court denied Gibson's request to call Clair because the latter had been present to assist defense counsel throughout the trial. Gibson was allowed to call Kenneally to the stand, however, to give the same information that Clair would have given about the dates and depth of the various audits.

Federal Rule of Evidence 615 provides that: "at the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses." The witness rule has been part of our law for centuries, and has its origins in the English common law. As Wigmore notes sequestration "already had in English practice an independent and continuous existence, even in the time of those earlier modes of trial which preceded the jury and were a part of our inheritance of the common Germanic law." VI Wigmore on Evidence § 1837 at 348 (3rd ed. 1940) *quoted in Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976). The rule serves two salutary purposes: (1) it prevents witnesses from tailoring testimony to that of other witnesses; and (2) it aids in detecting false testimony. *United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (en banc) *on reh.* 612 F.2d 887 (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980).

Our review of the District Court's action is limited to whether the court abused its discretion in denying Gibson's request to call Clair. The decision whether a witness who fails to obey a sequestration order may subsequently take the stand is undoubtedly one for the trial court. *United States v. Kiliyan*, 456 F.2d 555 (8th Cir. 1972); *United States v. Marson*, 408 F.2d 644 (4th Cir. 1968), *cert. denied*, 393 U.S. 1056, 89 S.Ct. 695, 21 L.Ed.2d 698 (1969); *United States v. Johnson*, 345 F.2d 457 (6th Cir.), *cert. denied*, 382 U.S. 836, 86 S.Ct. 83, 15 L.Ed.2d 79 (1965); *Spindler v. United States*, 336 F.2d 678 (9th Cir. 1964), *cert. denied*, 380 U.S. 909, 85 S.Ct. 894, 13 L.Ed.2d 797 (1965). The controlling principle in this Circuit is that violation of an order directing that witnesses be sepa-

rated does not automatically bar a witness' testimony. *United States v. Bostic,* 327 F.2d 983 (6th Cir. 1964). We have always heeded the following pronouncement of the Supreme Court:

> If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground merely, although *the right to exclude under particular circumstances may be supported as within the sound discretion of the trial court.*

*Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893) (emphasis added). *See also United States v. Brooks,* 303 F.2d 851 (6th Cir.), *cert. denied,* 371 U.S. 889, 83 S.Ct. 184, 9 L.Ed.2d 122 (1962). Most authorities agree that "particular circumstances" sufficient to justify exclusion of a witness are indications that the witness has remained in court with the "consent, connivance, procurement or knowledge" of the party seeking his testimony. *United States v. Kiliyan,* 456 F.2d at 560; *Taylor v. United States,* 388 F.2d 786 (9th Cir. 1967); *United States v. Bostic,* 327 F.2d 983 (6th Cir. 1964); *United States v. Schaefer,* 299 F.2d 625 (7th Cir.), *cert. denied,* 370 U.S. 917, 82 S.Ct. 1553, 8 L.Ed.2d 497 (1962).

Applying this test to the facts, it is clear that the court did not abuse its discretion in excluding Clair. First, we note that the government requested a Rule 615 order in open court without objection. Second, Gibson concedes that Clair remained in court with his knowledge and consent. In this regard we are not persuaded by Gibson's claim that his need to call Clair was unexpected. Defense counsel should have anticipated that Clair's testimony concerning the dates and scope of each audit might be necessary, if as defense counsel claimed, Clair was the only Union official sufficiently competent to describe the nature of the

audits. In fact, Clair would have been the logical choice to give this allegedly crucial testimony initially. Furthermore, Clair had testified at Gibson's first trial, although in a limited capacity.

We conclude that Gibson has failed to show any prejudice because Kenneally, defense counsel's substitute witness, gave substantially identical testimony to that Clair would have given, according to Gibson's offer of proof. Kenneally testified quite specifically that Gibson instructed Clair to "take a good look at Local 28's books" and "to do a good job on them and it's to be an in-depth audit." Gibson thus had an adequate opportunity to correct the mistakes Hanley had made in his testimony. In our view the District Court properly excluded Clair from the stand.[6]

## IV. CONCLUSION

We find no merit in Gibson's final contention that the prosecutor's closing arguments constituted misconduct. Accordingly, we affirm the judgment below in all respects.

---

**6.** Had Clair been the only witness available to testify, our conclusion on this issue might have differed. *See Calloway v. Blackburn,* 612 F.2d 201 (5th Cir. 1980). *See also United States v. Davis,* 639 F.2d 239 (5th Cir. 1981).