955 F.2d 45
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
David Allen COLLINS, Defendant-Appellant.
 No. 91-5215.
 United States Court of Appeals, Sixth Circuit.
 Feb. 20, 1992.
 
 1
 Before KEITH and NELSON, Circuit Judges; and HOOD, District Judge.*
 
 PER CURIAM
 
 2
 Defendant-appellant David Allen Collins ("Collins") appeals his jury conviction for conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341 and 371. For the reasons stated below, we AFFIRM.
 
 
 3
 * Collins served as the Coordinator of Elections for the State of Tennessee. As Coordinator, Collins oversaw all election matters that affected the state, including the interpretation of Tennessee laws regarding election matters, giving advice, and approving new election equipment. New election equipment also had to be approved by the Tennessee Election Commission, an autonomous body of five members appointed by the Tennessee General Assembly.
 
 
 4
 According to trial testimony, before September 1984, Collins telephoned Howell T. Powell ("Powell"), an appointee to the Election Commission, and told him of a plan in which they could make money. Collins informed Powell that he wanted to initiate a measure to change existing Tennessee law, which required ballot boxes to be made of metal, inorder to introduce a new ballot box made of fiberglass.[1] Powell agreed to assist Collins.
 
 
 5
 During this same period, Collins also contacted W.D. "Donnie" Walker ("Walker"), the Chief Compliance Officer for the State of Tennessee's regulation of Charitable Solicitations Division of the Secretary of State's Office. Collins told Walker about the scheme, and Walker also agreed to participate. Subsequently, Walker recruited Robert "Bob" Long ("Long"), a Chattanooga businessman. Long, in turn, recruited Jack Rhoden ("Rhoden"), another Chattanooga businessman. Thereafter, Long commissioned blue prints to be drawn of the new ballot box and a wooden prototype was built.
 
 
 6
 Collins, Powell, Walker, Long and Rhoden agreed to split the profits equally resulting in each co-conspirator receiving a 20% interest. The co-conspirators believed that they could make as much as a half million dollars in Tennessee.
 
 
 7
 In January 1985, the group approached Paul Linerode ("Linerode"), a salesman, who worked for Computer Election Systems ("CES"), a voting machine company. CES was encountering difficulties in getting one of their products approved in Tennessee. During a brief meeting at the Hyatt Hotel in Nashville, Tennessee, Walker and Collins decided to offer Linerode certification of CES' product in return for CES purchasing a certain number of ballot boxes and placing the box in CES' catalogue. Walker relayed this information to Linerode, stating that CES would receive immediate certification and the right to sell ballot boxes in every state except Tennessee. On April 1, 1985, Linerode advised Rhoden that CES was not interested.
 
 
 8
 In March of 1985, the Tennessee General Assembly amended the legislation that required ballot boxes to be metallic. On April 9, 1985, Collins, Powell, Rhoden and Walker discussed their individual roles in their scheme at Walker's apartment. Collins' role included introducing Rhoden to the Election Commission and, as Coordinator, approving the new fiberglass box. On April 10, 1985, Collins presented Rhoden to the Election Commission. On April 23, 1985, Rhoden again appeared before the Election Commission to answer questions regarding the wooden prototype ballot box. At no time did Collins reveal his twenty percent interest.
 
 
 9
 Subsequent to the April 23 meeting, Collins telephoned John McGrath ("McGrath") in an effort to create a marketing brochure. Collins thereafter delivered the prototype to McGrath. McGrath testified that the span from the initial contact until he returned the prototype was approximately six to ten weeks.
 
 
 10
 The co-conspirators met on several more occasions following their April meeting. In February 1987, David Haines ("Haines"), Collins' eventual successor, saw the wooden prototype in Collins' office. Haines testified that Collins gave him the impression that he was promoting the co-conspirators' box. Collins allegedly told Haines that as the new Election Coordinator, one of his first responsibilities would be to select a box. Collins resigned in March 1987.
 
 
 11
 On October 31, 1990, the grand jury returned a one count superseding indicted against Collins. The jury found Collins' guilty. On January 1, 1991, he was sentenced to three years imprisonment. This timely appeal followed.
 
 II
 
 12
 Collins first argues that the district court improperly denied his motion for a judgment of acquittal. He asserts that the evidence failed to prove that the conspiracy continued beyond May 8, 1985, thus the action is barred by the statute of limitations.[2] He also contends that his conviction was based on an intangible, non-property right theory.
 
 
 13
 The standard of appellate review of a motion for acquittal is the same standard applied by the district court. United States v. Weed, 689 F.2d 752, 756 (7th Cir.1982) (citations omitted). The district court must view the evidence and all reasonable inferences in the light most favorable to the government. United States v. Gibson, 675 F.2d 825 (6th Cir.1982). If the relevant evidence leads to the conclusion that a jury could reasonably find the defendant guilty beyond a reasonable doubt, we must affirm the district court's denial of an acquittal motion. Id. Viewing the evidence before us in the light most favorable to the prosecution, we find that there was sufficient evidence to support the jury verdict.
 
 A. Statute of Limitations
 
 14
 Collins asserts that the district court erred in not granting a judgment of acquittal for violation of 18 U.S.C. §§ 1341 and 371 because the counts are barred by the applicable statute of limitations.[3] Collins argues that the prosecution failed to prove beyond a reasonable doubt that an overt act in furtherance of the conspiracy occurred after May 8, 1985. See United States v. Zalman, 870 F.2d 1047, 1057 (6th Cir.1989).
 
 
 15
 Walker, a co-conspirator, testified that subsequent to the April 23, 1985, meeting with the Election Commission, Collins took the wooden prototype to McGrath to make a marketing brochure. According to Mr. McGrath's testimony, his contacts with Collins regarding the ballot box lasted six to ten weeks. Assuming a six week period, this incident occurred far beyond May 8. In addition, Mr. Haines, Collins' eventual successor, testified that Collins promoted the box to him immediately prior to resigning in March of 1987. Based on this testimony, there was sufficient evidence to support the jury's conclusion that an overt act in furtherance of the conspiracy occurred after May 8.
 
 B. The McNally Problem
 
 16
 Collins next alleges two issues of error pursuant to the principles of McNally v. United States, 485 U.S. 350 (1987). In McNally, the Supreme Court interpreted the "any scheme or artifice to defraud" language of the mail fraud statute, 18 U.S.C. § 1341. The Court held that the statute did not apply to intangible rights. Rather, the statute applied only to the protection of property rights. Id. at 356, 360.[4] Pursuant to McNally Collins first argues that his conviction was based on an intangible, non-property right theory. Second, Collins contends that the prosecution failed to prove that the State of Tennessee would have been defrauded of property or money had the scheme proved successful. The government, according to Collins, failed to prove that the co-conspirators rigged the bidding process. We believe that these arguments are meritless.
 
 
 17
 In United States v. Kerkman, 866 F.2d 877 (6th Cir.1989), the defendant appealed convictions for mail fraud and conspiracy. The defendant alleged that the district court erred because his conviction was based on an intangible rights theory in violation of McNally. The Kerkman court rejected defendant's arguments. The court stated that in determining whether a conviction will be upheld in the aftermath of McNally, we "must look to the substantive allegations of the indictment and the jury instructions to determine whether the conduct alleged and necessarily found to have occurred by the jury constituted an offense." Id. at 879, citing United States v. Horton. 847 F.2d 313, 321 (6th Cir.1988). Like Kerkman, the indictment in the present case charged that Collins and other persons "utilize[d] the mails in furtherance of a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent promises, pretenses, and misrepresentations." Also similar to Kerkman, the district court in the present case charged the jury that "[i]f you find that had the alleged scheme been successful, the participants in the scheme would have acquired money from the state of Tennessee to which they were not entitled, you may conclude that the Government has shown that Tennessee would have been defrauded of money and property." According to Kerman, this language is sufficiently clear to demonstrate that Collins' convictions were not based on an intangible rights theory.
 
 
 18
 Moreover, we find no merit in Collins' assertion that his conviction should be reversed in light of McNally because the prosecution failed to prove that Tennessee was deprived of money or property. Collins contends that the government did not prove that the bid was rigged. As a result, there was never a guarantee that Tennessee would have paid them money. In Ames v. Sintering Co., 927 F.2d 232, 235 (6th Cir.1990), we held that "the government need only charge that the defendant intended to defraud the victim of money or property, not that the victim was actually deprived of money or property." Id.; see also U.S. v. Utz, 886 F.2d 1148, 1151 (9th Cir.1989) ("It is enough after McNally, as before, that the government charge and the jury find either that the victim was actually deprived of money or property or that the defendant intended to defraud the victim of the same.") (emphasis in original) Accordingly, we reject Collins' assertion.
 
 III
 
 19
 Collins next argues that his due process rights were violated because of an impermissible amendment or a prejudicial variance from the grand jury indictment. In essence, Collins alleges that the government changed its theories of prosecution from a tainted bid to a kickback theory when the evidence adduced at trial failed to prove its original theory.
 
 
 20
 An amendment occurs when the charging terms of an indictment are altered. United States v. Weissman, 899 F.2d 1111, 1114 (11th Cir.1990). Jury instructions that amend a grand jury indictment are per se reversible error. Id. Such an amendment violates a defendant's constitutional right to be tried only on charges presented in the grand jury indictment and creates the possibility that the defendant may have been convicted on grounds not alleged in the indictment. United States v. Jones, 647 F.2d 696, 700 (6th Cir.), cert. denied, 454 U.S. 588 (1981). By contrast, a variance occurs when the facts proved at trial differ from those charged in the indictment. United States v. McMahon, 861 F.2d 8 (1st Cir.1988) (citation omitted). "A variance becomes reversible error only if the facts established in trial materially diverge from the facts in the indictment and the defendant suffers substantial prejudice as a result." Weissman, 899 F.2d at 1111.
 
 
 21
 After reviewing the entire record, we conclude that there was neither an amendment nor variance. The record shows that the jury instructions are in accord with the charging terms of the indictment. Similarly, the proof adduced at trial supported the facts alleged in the indictment. Thus, we find no basis to conclude that there was reversible error.
 
 IV
 
 22
 Next, Collins argues that the district court abused its discretion in denying his motion to transfer this case from the Eastern District of Tennessee, Chattanooga to the Middle District of Tennessee, Nashville.
 
 
 23
 The decision to transfer rests within the discretion of the trial judge. Platt v. Minnesota Mining Manufacturing Co., 376 U.S. 240, 245 (1964). The denial of a motion to transfer under Fed.R.Crim.P. 21(b) is erroneous only if the district judge commits an abuse of discretion. United States v. Keuylian, 602 F.2d 1033, 1038 (2d Cir.1979). Both parties agree that the district court utilized the proper factors in deciding the motion to transfer. See Platt. The court also must consider "any special elements which might affect transfer." Id., 376 U.S. at 244. It is within the district court's discretion to balance these factors and determine which factors are of greatest import. See 2 C. Wright, Federal Practice and Procedure: Criminal, § 344, at 275 (2d ed. 1982)
 
 
 24
 There is no evidence that leads us to conclude that the district court abused its discretion in denying Collins' motion to transfer the case from the Eastern District, Chattanooga to the Middle District, Nashville. Collins and his attorney resided in Nashville, but the government attorney and grand jury investigation occurred in the Eastern District, Chattanooga. The district court noted that Chattanooga was accessible to Collins and his attorney since the two cities are only two hours apart. Collins, himself, asserted that both districts are easily accessible. In addition, the district court found that Collins failed to demonstrate a showing of inconvenience to the witnesses. Consequently, we find that the district court did not abuse its discretion.
 
 V
 
 25
 Collins also contends that the cumulative effect of the government's conduct was so outrageous in nature as to require reversal of his conviction. As the district court stated, "the defendant did not argue prosecutorial misconduct to [the district] [c]ourt." Because this issue was not properly preserved for appeal, we are not permitted to consider its merits. United States v. Hamilton, 689 F.2d 1262, 1275 (6th Cir.1982).
 
 VI
 
 26
 Finally, Collins asserts that the jury instructions constitute plain error. We disagree. Collins did not object to any of the allegedly erroneous jury instructions. Therefore, Collins ordinarily would be precluded from raising the jury instruction claim on appeal unless there was plain error that substantially affected his rights. Fed.R.Crim.P. Rule 52(b)
 
 
 27
 The relevant part of the district court's charge to the jury is as follows:
 
 
 28
 The government must also prove that an agreement of the conspirator included a scheme to defraud the State of Tennessee of money or property. It is a violation of Tennessee law for a state employee or official to bid on or to sell merchandise to the state.
 
 
 29
 It is also a violation of state law for a state official or employee to accept a kickback or anything of value from vendors who sell merchandise in the state.
 
 
 30
 If you find that had the alleged scheme been successful, the participants in the scheme would have acquired money from the State of Tennessee to which they were not entitled, you may conclude that the government has shown that Tennessee would have been defrauded of money or property. The government need not prove that the scheme was successful or that the state actually lost any money.
 
 
 31
 Taken as a whole, the allegedly erroneous jury instruction does not contain a plain error or defect. The instructions were descriptive, accurate, not prejudicial and legally sufficient. Accordingly, the district court did not commit plain error.
 
 VII
 
 32
 For the above stated reasons, we AFFIRM the conviction and sentence by the Honorable R. Allan Edgar, United States District Judge for the Eastern District of Tennessee.
 
 
 
 *
 The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 During this period, Tennessee Code Annotated §§ 12-3-106 and 12-4-103 prohibited state employees from bidding on State contracts and accepting gifts from individuals seeking to do business with the State of Tennessee
 
 
 [2]
 The parties concede that May 8, 1985, was the operative date for the statute of limitations to begin running
 
 
 [3]
 Title 18, U.S.C. § 3282 provides:
 Except as otherwise provided by law, no person shall be prosecuted, tried or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.
 
 
 [4]
 The McNally decision has been reversed by congress effective November 18, 1988. 18 U.S.C. § 1346. All events charged in the indictment pre-date this legislation. Therefore, the Supreme Court's decision in McNally applies