19 F.3d 1430
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Philip FANKHAUSER, Defendant-Appellant.
 No. 93-5288.
 United States Court of Appeals, Fourth Circuit.
 Submitted Jan. 18, 1994.
Decided March 1, 1994.
 
 Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling. Frederick P. Stamp, Jr., District Judge.
 John J. Pizzuti, Camilletti, Sacco & Pizzuti, Wheeling, W. V., for appellant.
 William D. Wilmoth, United States Attorney, Paul T. Camilletti, Assistant United States Attorney, Wheeling, W.V., for appellee.
 N.D.W.Va.
 AFFIRMED.
 Before PHILLIPS and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Philip Fankhauser was convicted of making false declarations to a grand jury in violation of 18 U.S.C. Sec. 1623 (1988), and received a sentence of twenty-seven months. He appeals his conviction and his sentence. We affirm.
 
 
 2
 The basis of the charge against Fankhauser was testimony he gave during a grand jury investigation of alleged witness tampering. The government's case was presented largely through the testimony of Tom Alvis, a member of the Barbarian Motorcycle Club, and Trish Damron, Alvis' former girlfriend. In early 1992, Alvis was acting as a confidential informant for Bill Beatty, a local police officer and drug task force agent, who was conducting an investigation of the Barbarians. Alvis made a number of controlled drug buys from other Barbarians. Fankhauser lived with Alvis and Damron, as did Damron's friend, Helen Williams. Fankhauser was not a member of the club, but he socialized with the Barbarians at their clubhouse.
 
 
 3
 Alvis told Damron about his undercover activities, and Damron eventually told Fankhauser, Williams, and Michael Kusic, a Barbarian member. Fankhauser gave Damron a tape recorder and asked her to tape a conversation with Alvis which would confirm his undercover role, but she was unable to do so. During this time, unknown to Alvis, Damron and Fankhauser became romantically involved.
 
 
 4
 On March 20, 1992, Alvis received a call from Mike Gregg (Mad Mike), president of the Barbarians, who asked him to come to the clubhouse. Fankhauser was still eating dinner when Alvis and Damron left their house. However, he took another route and arrived at the clubhouse before they did. Alvis and Damron both testified that Fankhauser was present when Alvis was confronted outside the building by Mike Gregg and two other Barbarians, Ray Chillcott (Lurch), and David Mallicone (Rocco), all of whom were armed. Alvis said that when he came around the corner of the clubhouse from the parking lot, Fankhauser was talking to Gregg at the door. Alvis testified that Gregg and Mallicone carried shotguns which they kept pointed at him; Chillcott had a pistol. Alvis was asked whether he was an informant, and he admitted he was. He was forced to undress partially to show that he was not wearing a recording device.
 
 
 5
 Damron was upset by the turn of events. Alvis testified that she was crying badly. Damron testified that she complained to Chillcott that Kusic had told her she would be warned before anything of the kind happened. After she used the bathroom inside the clubhouse, Fankhauser took her home, where she gathered Alvis' Barbarian related belongings and gave them to Fankhauser to be returned to the club. She then moved out, as did Fankhauser.
 
 
 6
 Alvis testified that he was next questioned inside the clubhouse for about an hour. The Barbarians wanted to know what information he had given to Beatty. After that, Alvis was released. He called Beatty, went home, and discovered that his Barbarian-related belongings had been removed. Alvis saw Damron and Fankhauser briefly at Damron's mother's house that evening; however, Damron was unavailable when Beatty tried to talk to her.
 
 
 7
 Damron testified that she went to Ray Chillcott's house in Pennsylvania, where she stayed for a week or two. Subpoenas were issued for both Fankhauser and Damron. At some point, Fankhauser and Damron were present at a hotel in Pennsylvania with Chillcott and Mike Gregg for a discussion of the situation. During this meeting, Fankhauser made a long-distance call to Beatty, asked about the subpoena, and said he would talk to Beatty only at his lawyer's office.
 
 
 8
 On April 2, 1992, Fankhauser was called before a grand jury investigating possible charges of witness tampering against Gregg, Mallicone, and Chillcott.[1] He testified that he did not know Mike Gregg, and had not seen anyone point guns at Alvis on March 20. He said that he had stayed outside the clubhouse that night, while Alvis went inside, and that the bits and pieces of conversation he heard through the partially open door led him to believe that Alvis was being thrown out of the club for dealing drugs. He said that was the reason Damron was upset and asked to be taken home.
 
 
 9
 In June 1992, Damron began to cooperate with Beatty. In October, Fankhauser was charged with making false statements to the grand jury. Fankhauser moved to dismiss the superseding indictment on the ground that his allegedly false statements were immaterial to the grand jury's investigation. A magistrate judge recommended denial of the motion. Before trial, the district court heard in camera testimony from the grand jury foreman and found that Fankhauser's statements were material. At the close of the government's case, the district denied the motion to dismiss.
 
 
 10
 At trial, Fankhauser's trial testimony was consistent with his grand jury testimony. He introduced a tape of a monitored phone call made to him by Damron in July 1992 while she was cooperating with Beatty. On the tape, Damron asked Fankhauser to help her refresh her memory about what happened on March 20. Fankhauser stated that he was outside while the others were inside.
 
 
 11
 Fankhauser called Helen Williams as a witness. She had moved out of the house she shared with Damron and Alvis several weeks before March 20, 1992. She testified that she met Damron in a bar sometime in April 1992, but the court excluded on hearsay grounds her account of what Damron had told her concerning the events of March 20. Fankhauser then attempted to recall Damron. However, Damron had been excused after her testimony for the government and had remained in the courtroom. Because a sequestration order was in effect, the district court refused to allow Damron to testify again.
 
 
 12
 During the trial, Fankhauser's attorney accepted the hearsay ruling without comment, though he objected to the court's refusal to allow him to recall Damron. During the charge conference, the attorney unsuccessfully sought permission to reopen the defense case and to introduce the testimony of Williams and Damron. He explained that he had intended to impeach Damron's credibility by introducing, through Williams, evidence that Damron had described the incident of March 20, 1992, to Williams about a month later when they met in a bar, saying that she was not permitted to go upstairs with Alvis, that "she knew beforehand ... that they knew about Tom," and that she left because she feared retaliation by Alvis. Counsel argued that Damron's statement was admissible as a hearsay exception under Fed.R.Evid. 804(b)(3) because Damron was unavailable in that she had testified previously that she did not remember what she told Williams about the events of March 20. He argued that her statement to Williams was against her interest because it differed from her statement to the grand jury and might subject her to criminal liability. The district court denied the motion to reopen, finding that any objection to the hearsay ruling had been waived, and that to allow Damron to testify again would violate the sequestration order.
 
 
 13
 Following his conviction, Fankhauser moved for a new trial. Among the errors alleged was the government's failure to disclose the fact that Damron was paid by the government during her cooperation. He also claimed that the government had failed to prove specific intent to deceive. The motion was denied. During the sentencing proceeding, Fankhauser contested the calculation of his guideline range recommended in the presentence report, without success.
 
 
 14
 On appeal, Fankhauser renews the arguments he made in the district court concerning all these issues. He claims first that Williams' proffered testimony about Damron's April 1992 statement to her was admissible as a prior inconsistent statement under Fed.R.Evid. 613(b), and also as a statement against interest by an unavailable witness under Rule 804(b)(3) because, when she testified, Damron said she did not remember the conversation.
 
 
 15
 We find that the testimony was properly excluded. Although a witness' prior inconsistent statement may be introduced through extrinsic evidence under Fed.R.Evid. 613(b), the witness must first be given an opportunity to explain it. Damron was not questioned about her prior statement to Williams during her testimony. Therefore, even assuming that the alleged statement to Williams would have impeached Damron's testimony, it was not admissible under Rule 613(b).
 
 
 16
 Moreover, three prerequisites must be met before hearsay may be introduced under Rule 804(b)(3): (1) an unavailable declarant, (2) a statement which is against the proprietary or penal interest of the declarant at the time it was made, and (3) corroborating evidence of the statement's trustworthiness. United States v. MacDonald, 688 F.2d 224, 232-33 (4th Cir.1982), cert. denied, 459 U.S. 1103 (1983). Because she could not testify again, Damron was arguably unavailable. The proffered statement she allegedly made to Williams did not contradict Fankhauser's testimony, while her trial testimony agreed with Alvis' version of the events of March 20. As a result, there was no strong corroboration of either statement. Most importantly, the statement allegedly made to Williams was not against Damron's interest when she made it. Therefore, the district court did not abuse its discretion in excluding Williams testimony about the statement as hearsay, and refusing to find it an exception under Rule 804(b)(3), particularly when the arguments for admission were not made until the charge conference.
 
 
 17
 The district court's refusal to allow the defense to recall Damron after she finished her testimony for the government is reviewed for abuse of discretion. United States v. Gibson, 675 F.2d 825, 835 (6th Cir.), cert. denied, 459 U.S. 972 (1982). When the party seeking the testimony of a witness has consented to the presence of the witness in the courtroom in violation of the sequestration order, that circumstance justifies exclusion of the witness. Gibson, 675 F.2d at 836.
 
 
 18
 At the beginning of Fankhauser's trial, the district court ordered the witnesses sequestered at the government's request. Following Damron's testimony, the government attorney released her from the sequestration order and informed Fankhauser's attorney that he was doing so. Not anticipating that he would want to call her as a witness, defense counsel allowed Damron to remain in the courtroom. In these circumstances, the district court did not abuse its discretion in excluding Damron as a witness for the defense.
 
 
 19
 Next, Fankhauser contends that the government's failure to disclose payments made to Damron while she was a protected witness requires a new trial. The parties agree that about $3000 was paid to Damron while she was cooperating, and that this fact was not disclosed to Fankhauser before trial despite a defense request for impeachment material. Fankhauser does not allege bad faith on the part of the government; however, the failure to disclose requested evidence which is favorable to the defendant, and which is material, violates due process even without bad faith on the part of the government. Brady v. Maryland, 373 U.S. 83, 87 (1963). Impeachment evidence going to credibility, the type of evidence at issue here, is within the Brady rule if it is material. United States v. Bagley, 473 U.S. 667, 678 (1985). Such evidence is material if there is a reasonable probability that its disclosure to the jury would change the outcome of the trial. Id. A "reasonable probability" is a probability sufficient to undermine confidence in the verdict. Id. at 682.
 
 
 20
 In this case, the district court found that the information was not material because Damron's trial testimony was substantially similar to her testimony before the grand jury, and was corroborated by Alvis' testimony. While this reasoning is not completely convincing,[2] we find that a new trial is not required because Damron's own testimony established that she was a deceitful person. Moreover, she testified, accurately or not, that she had been offered immunity in return for her cooperation. Evidence that she had been paid during her cooperation without doubt would have provided additional impeachment. However, the government's case really depended on whether the jury found Alvis a credible witness. The testimony of Alvis was sufficient to convict Fankhauser if the jury found him credible. Therefore, the failure to disclose payments to Damron is not material in that it does not undermine confidence in the verdict. Bagley, 473 U.S. at 678.
 
 
 21
 Fankhauser also maintains that there was insufficient evidence of his intent to deceive the grand jury. In order to prove an offense under Sec. 1623, the government must show that the defendant made a material false statement with the knowledge that it was false. United States v. Dudley, 581 F.2d 1193, 1196 (5th Cir.1978). Although willful intent to deceive is not an element of the offense, United States v. Fornaro, 894 F.2d 508, 512 (2d Cir.1990), Fankhauser's intent to deceive can be inferred. Taken in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80 (1942), the evidence at trial was sufficient for the jury to find that Fankhauser had knowingly made false statements to the grand jury. Further, even though Gregg, Mallicone, and Chillcott were eventually indicted, Fankhauser's false statements were material because they were clearly capable of impeding the grand jury's investigation. United States v. Flowers, 813 F.2d 1320, 1325 (4th Cir.1987).
 
 
 22
 Finally, Fankhauser argues that in sentencing him the district court clearly erred by giving him an eight-level increase under guideline section 2J1.2(b)(1) and a three-level increase under section 2J1.2(b)(2). We find no error in the sentence calculation.
 
 
 23
 The sentencing guideline applicable to Fankhauser's conviction under Sec. 1623 is section 2J1.3. Because his offense involved perjury concerning another criminal offense (witness tampering), guideline section 2X3.1 (Accessory After the Fact) was applied, as directed by section 2J1.3(c)(1). Section 2X3.1 provides that the guideline for the underlying offense should be used, but should be reduced by six offense levels.
 
 
 24
 Because Fankhauser's false statements concerned an underlying offense of obstruction of justice, guideline section 2J1.2 was used. After his base offense level was decreased by six, it was increased by eight levels because the other criminal offense involved a threat to do physical injury to a person. U.S.S.G. Sec. 2J1.2(b)(1). Fankhauser maintains that the enhancement was not warranted because Gregg, Mallicone, and Chillcott were ultimately acquitted of witness intimidation. However, acquitted conduct may be the basis for a sentencing enhancement if it is proved by a preponderance of the evidence. United States v. Isom, 886 F.2d 736, 738 (4th Cir.1989). Whether the Barbarians held loaded guns on Alvis, as described by Alvis, is a factual finding; the clearly erroneous standard applies to fact findings. United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir.1989). The court's factual finding that the event did occur and involved an implied threat to Alvis is not clearly erroneous.
 
 
 25
 Because the grand jury indicted Gregg, Mallicone, and Chillcott in spite of his testimony, Fankhauser contends that the three-level enhancement under section 2J.2(b)(2) for an offense which substantially interferes with the administration of justice did not apply. However, Application Note 1 explains that "substantial interference with the administration of justice" includes the premature termination of a felony investigation. The events of March 20, 1992, terminated the investigation of the Barbarian Motorcycle Club, and therefore the enhancement was not clearly erroneous.
 
 
 26
 Accordingly, the judgment of the district court is affirmed. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.
 
 
 
 [1]
 They were later charged with witness tampering and other offenses. They were acquitted of witness tampering, and the district court directed a verdict of acquittal on the remaining counts related to intimidation of Alvis
 
 
 [2]
 Damron did not testify before the grand jury until after she began to cooperate with the government. If she actually were induced to testify falsely in return for payment, her testimony would naturally agree with that of the other government witness