RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0239P (6th Cir.)
File Name: 03a0239p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            *v.*

JOSE RUIZ SOLORIO
(01-5602); RICKY MARTIN
LUNA (01-5603); DELMAS
DENNIS (01-5666); MARCO
JUAREZ (01-5667),
            *Defendants-Appellants.*

Nos. 01-5602/
5603/5666/5667

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 99-00120—Aleta A. Trauger, District Judge.

Submitted and Argued: April 29, 2003

Decided and Filed: July 22, 2003

Before: MOORE and ROGERS, Circuit Judges; KATZ,
            District Judge.*

_____

* The Honorable David A. Katz, United States District Judge for the
Northern District of Ohio, sitting by designation.

_____

## COUNSEL

**ARGUED:** Robert L. Marlow, Shelbyville, Tennessee, Michael D. Noel, Nashville, Tennessee, for Appellants. John A. Drennan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Robert L. Marlow, Shelbyville, Tennessee, Michael D. Noel, Nashville, Tennessee, Thomas J. Drake, Jr., Nashville, Tennessee, Paul J. Bruno, BRUNO, HAYMAKER & HEROUX, Nashville, Tennessee, for Appellants. John A. Drennan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Robert Anderson, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Delmas Dennis, Marco Juarez, Jose Ruiz Solorio, and Ricky Martin Luna were all arrested for conspiring to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 841, as well as for other various drug-related crimes. The four defendants were part of a vast drug enterprise that brought large quantities of cocaine and marijuana into Nashville. They were convicted by a jury of these crimes and given sentences ranging from 210 months (Solorio) to 292 months (Juarez).

On appeal, they together raise nine claims of error. For the reasons that follow, we find none of their claims of error persuasive, and so we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual Background

The defendants in this case were all part of a drug ring that bought, transported, and sold sizeable amounts of marijuana and cocaine. The leaders of this operation (which was based in Nashville) were Terrell McMurry and Timothy Booker. McMurry and Booker, as putative defendants, entered into plea agreements with the government, and thus became the government's key witnesses at trial. They testified extensively to the roles of the four defendants in the overall conspiracy.

McMurry and Booker began distributing cocaine and marijuana in 1994. They had two main sources of drugs. The first were Omar Rocha Rodriguez (known as Omar Rocha) and Adriana Rocha Espinoza (a woman who lived with Rocha). Rocha and Espinoza lived in San Diego and sent drugs to McMurry and Booker through Chicago. The shipments from Rocha and Espinoza, which each consisted of between twenty and forty kilograms of cocaine, came three times from May 1998 to August 1999 (this being the time period stated in the indictment). The second source of drugs came from a source known as "Alex," who was in Chicago.

At trial, Booker and McMurry explained that the conspiracy operated in the following way. When the drugs arrived in Nashville, they were delivered by a green Tahoe truck, which Luna (who was also known as "Playboy") would meet. The drugs were unloaded by Luna, Juarez, McMurry, and Quentin Hearn.[1] The drugs were generally kept at the homes of Juarez, McMurry, or Hearn. Especially large loads

---

[1] Quentin Hearn, McMurry's cousin, was another putative defendant who accepted a deal with the government and testified against the defendants at trial.

were stored at Solorio's ranch. McMurry and Booker gave the money to pay for the cocaine and marijuana to Juarez, who gave it to Luna, who gave it to the parties owed.

### 1. Juarez's Role in the Conspiracy

Juarez was employed directly by McMurry and Booker. They paid him a salary, roughly between four and five thousand dollars a month. Juarez helped McMurry and Booker transport and unload cocaine. He also helped send cash payments back to McMurry's and Booker's suppliers. As the operation developed, McMurry, Booker, and Rocha rented an apartment for Juarez in Chicago so that Juarez could deliver drugs to McMurry's and Booker's customers there.

In addition to McMurry's and Booker's testimony, there was considerable other evidence against Juarez. Juarez was stopped by police in Chicago on October 30, 1998. He consented to a search, in which the FBI discovered that the vehicle had been retrofitted with hidden compartments of a type that were used for transporting drugs. The FBI intercepted phone calls between Juarez and McMurry discussing Juarez's plans to unload a shipment of drugs into Hearn's house and revealing that one of the 50-pound shipments of marijuana was short. The FBI also intercepted phone calls between Juarez and Booker discussing various drug-related matters. Juarez was photographed with McMurry and Booker visiting Rocha in San Diego and was also seen with Rocha in Chicago several times.

More evidence against Juarez was obtained in the course of his arrest on March 18, 1999. That morning Juarez had left the apartment he leased at 710 Saxony Drive in a white pickup, went to Hearn's residence to unload the forty pounds of marijuana that were in the truck, and was arrested while driving away. After his arrest, the police searched his apartment pursuant to a valid search warrant. In the apartment, they found two 9-mm Glock handguns. The guns

were located inside a pair of boots, which were on top of a small black bag. Inside the bag was a variety of drug trafficking tools: a money counter, drug ledgers, paper money wrappers, and rubber bands. In the search of the apartment, officers found one of Luna's pagers. They also found drug ledgers with the name "Cepillo" next to some figures.

## 2. Luna's Role in the Conspiracy

Luna, like Juarez, aided in the transport and delivery of drugs, counted drug money, and transported McMurry and Booker's cash payments back to the drug suppliers. Luna was not employed directly by McMurry and Booker. Instead, he worked principally for Rocha and was seen with him in Chicago several times.

In addition to Booker's and McMurry's testimony against Luna, there was other independent evidence implicating Luna in the conspiracy. On January 29, 1999, the Nashville police stopped Luna. They found that his vehicle, like Juarez's, had been retrofitted with hidden compartments. The FBI, who was intercepting McMurry's conversations, overheard McMurry and Espinoza discussing this stop. Luna was also visually spotted by the government both with McMurry (in a parking garage) and with Rocha and Espinoza (in the Los Angeles Airport).

On April 15, 1999, after Juarez had been arrested, the police searched Luna's Nashville apartment pursuant to a valid warrant. They found transaction receipts bearing his name, receipts bearing Juarez's and Espinoza's names, and a document indicating that a "Solorio Ruiz Jose" (presumably the defendant, Jose Ruiz Solorio) had rented an automobile. The police also found a drug ledger, balls of elastic bands commonly used in drug transactions, a number of cellular telephones, and a yellow sheet of paper with "Sepillo" written on it. Two days later, Luna was arrested. In his possession

were a Mexican passport, a visa, and a border-crossing card all with the name Omar Saenz Neda.[2] The picture in the passport, however, was of Luna.

## 3. Dennis's Role in the Conspiracy

Dennis was McMurry's and Booker's largest drug customer; McMurry testified that Dennis normally received half of each arriving drug shipment. Hearn testified that he delivered the drugs to Dennis at his store and returned Dennis's payment to McMurry and Booker. In one transaction, Dennis paid McMurry $60,000 for cocaine.

It was through a wiretap that the government discovered that Dennis was involved with McMurry. Government agents intercepted a conversation between Dennis and McMurry. Though the conversation was essentially in code — Dennis and McMurry deliberately used phrases and terms that only those inside the conspiracy would understand — McMurry "decoded" the conversation at trial, explaining how the conversation really was about how Dennis owed $6,000 to McMurry and how Dennis needed to return a number of short-weighed kilograms of cocaine (known as "bad checks").

---

[2]In a subsequent search of Rocha's residence, officers found a wallet with a Mexican driver's license, a Mexican voting card, and a Mexican birth certificate all in the name of Omar Saenz Neda. In this search, police found several pieces of paper with "Cepillo" and "Jose Ruiz" written on them, drug ledgers, and a personal planner with Luna's, Juarez's, and Solorio's names, and Solorio's cell-phone number.

### 4.  Solorio's Role in the Conspiracy

Jose Ruiz Solorio, who was known as "Cepillo,"[3] was more loosely connected to these drug transactions.  While Booker and McMurry knew the other three defendants intimately and testified extensively against them, they had less of a connection to Solorio.  McMurry and Booker never talked to or met Solorio before his arrest.  McMurry did testify, however, that they often stored drugs at Solorio's ranch in the Nashville area.

The more significant ties were between Solorio and Rocha. The FBI intercepted several telephone conversations between them.  In one of these essentially coded conversations, Solorio spoke of getting one thousand "tires" out in a week — "tires" apparently being euphemisms for units of cocaine. After the FBI intercepted another of Solorio's and Rocha's conversations, Solorio was photographed with Rocha and another man by the name of Moises Picos-Picos.[4]

Moises Picos-Picos, who also testified for the government at trial, worked for Solorio.  Solorio leased an apartment for Picos-Picos and arranged for him to come over from Tijuana to help Solorio.  Picos-Picos undertook many drug-related tasks for Solorio, such as delivering bags of cocaine and money and keeping records of his drug transactions.

On August 17, 1999 (after the arrests of Juarez and Luna), law enforcement officers executed an arrest warrant for

---

[3]Both Officer Taylor and Agent Williams testified that Cepillo was an alias for Solorio.  Agent Gomez, a translator with the FBI, testified that her analysis of the wiretapped conversations revealed that Cepillo was actually a nickname for Solorio.  Moreover, Solorio admitted at one point that he was known as Cepillo, as discussed below.  Solorio's name is often spelled "Solario" in various documents related to this case.

[4]Picos-Picos is sometimes known as Picos-Peraza or just Peraza.

Solorio.  Solorio was asked if he was "Cepillo" and raised his hand and nodded.[5]  McMurry testified that after Solorio was arrested, Solorio approached him in jail and told him that he had 40 kilograms of drugs buried at his Nashville ranch that needed to be excavated.

### B.  The Results of the Jury Trial

The jury convicted the defendants on different counts of the indictment.  All were convicted on Count 7 of the indictment, which alleged that the defendants had conspired to possess with intent to distribute cocaine in the amount of 5 kilograms or more from May 31, 1998 to August 17, 1999.  While Juarez, Luna, and Dennis were all convicted on Count 7 in the full amount of 5 kilograms or more, Solorio was only convicted of conspiring with respect to 500 grams or more.

Dennis was convicted only on Count 7.  He was sentenced to 240 months.  Luna was convicted on Count 4 (conspiracy to possess with intent to distribute 100 kilograms of marijuana) as well as Count 7.  Luna was sentenced to 235 months.  Solorio, in addition to Count 7, was convicted on Count 10 (possession with intent to distribute 500 grams or more of cocaine) and Count 11 (possession with intent to distribute 100 kilograms or more of marijuana).  Solorio was sentenced to 210 months.  Juarez was convicted on Counts 2 (possession with intent to distribute 500 grams or more of cocaine), 3 (attempt to conduct a financial transaction affecting interstate commerce involving the proceeds of unlawful activity), and 4 (conspiracy to possess with intent to

---

[5]The name "Cepillo" had been found in documents in Rocha's residence along with papers with the name "Jose Ruiz" (Solorio's first name).  "Cepillo" was listed as a client in the drug ledger found in Juarez's apartment.  The name "Cepillo Tires" was found in ledgers in Luna's apartment ("tires" again often being used as a code for units of cocaine).  A receipt bearing Solorio's real name was also found at Luna's apartment.

distribute 100 kilograms or more of marijuana), as well as Count 7. He was sentenced to concurrent terms, the longest of which is 292 months.

## II. ANALYSIS

The defendants raise a total of nine issues on appeal. The defendants allege that the district court erred in holding that the evidence was sufficient and that a new trial was not needed, failed to exclude the testimony of government witnesses after they violated a sequestration order, improperly refused to dismiss a juror who knew a government witness in the case, imposed sentences in violation of *Apprendi*, failed properly to resolve contested issues of fact as required by Federal Rule of Criminal Procedure 32, improperly enhanced a sentence for the possession of a firearm, unacceptably failed to reduce a sentence for a defendant's mitigating role, improperly enhanced a sentence for a defendant's supervisory role, and failed to depart downwards on a number of discretionary issues. As we explain below, we conclude that none of these contentions of error have merit.

## A. Sufficiency of the Evidence

Luna and Solorio argue that the district court erred in denying their Federal Rule of Criminal Procedure 29 motions for acquittal. Ultimately, we conclude that the evidence against them is sufficient to uphold their convictions, and so we reject their claims. Solorio then makes the related argument that the jury finding that he possessed with intent to distribute 500 grams of cocaine is fundamentally inconsistent with the indictment (which alleged that he possessed with intent to distribute 5 kilograms of cocaine). As we consider the facts adduced at trial not to be fatally incompatible with the indictment, we reject this claim.

### 1. Standard of Review

"This court reviews de novo a denial of a motion for judgment of acquittal, but affirms the decision 'if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt.'" *United States v. Harrod*, 168 F.3d 887, 889-90 (6th Cir.) (citation omitted), *cert. denied*, 526 U.S. 1127 (1999).

### 2. Luna's Insufficiency Claim

Luna alleges that the evidence against him was insufficient because, when he was arrested, there were no drugs or large sums of money in his possession. Nevertheless, we hold that the evidence is clearly sufficient against him. McMurry, Booker, and Hearn all testified extensively against Luna, explaining that Luna transported and delivered drugs and paid off their suppliers. Luna was photographed with Rocha several times. State police had stopped Luna in a car outfitted for transporting narcotics, and this incident became a topic of conversation between McMurry and Espinoza. A search of Juarez's apartment revealed Luna's cell phone. A search of Luna's apartment revealed drug ledgers, balls of elastic bands commonly used in drug transactions, and a number of cellular telephones. Finally, when Luna was arrested, he was found with a Mexican passport, a visa, and a border-crossing card all with the name Omar Saenz Neda. Luna's argument that the evidence was somehow insufficient because he did not possess any drugs on his person at the time of his arrest is simply unpersuasive.

### 3. Solorio's Insufficiency Claim

Solorio also claims that the evidence was insufficient against him. Solorio argues that the evidence was not sufficient to support the jury verdict on Count 7 (the conspiracy charge) or on Counts 10 and 11 (the possession

charges). Solorio also argues that a fatal variance was created between the evidence adduced at trial and the terms of the indictment. We reject all of these claims of error.

### a. Sufficiency of the Evidence With Respect to Count 7

Solorio's first argument is that there was not sufficient evidence to convict him of the conspiracy to distribute cocaine charge (Count 7). While the evidence is not quite as overwhelming as it was in Luna's case, the evidence against Solorio is certainly sufficient. There is evidence that Solorio was connected to McMurry's and Booker's operation. Because Rocha was McMurry's and Booker's supplier, Solorio as Rocha's agent was part of the conspiracy. In addition, there were far more direct ties between Solorio and McMurry's and Booker's operation. McMurry explicitly testified that his and Booker's drugs were kept at Solorio's ranch. As described earlier, searches of Rocha's, Luna's, and Juarez's apartments all revealed evidence that Solorio was a part of their combined operation. There was also extensive testimony from Picos-Picos establishing Solorio's relationship with Rocha and the various drug deals he made and authorized Picos-Picos to conduct. We hold that a reasonable jury could well have found that Solorio was part of the Count 7 conspiracy.

### b. Sufficiency of the Evidence With Respect to Counts 10 and 11

Solorio also claims that there is insufficient evidence to support his conviction on Counts 10 and 11, which are charges of possession of 500 grams or more of cocaine and 100 kilograms or more of marijuana. We hold that there is sufficient evidence to support these charges. Picos-Picos testified that Solorio arranged for Picos-Picos to deliver one kilogram of cocaine. Solorio's drug records, as Picos-Picos testified, showed a single drug transaction involving 500

pounds of marijuana and $210,500. In the context of this case, we find this testimony sufficient to support Solorio's convictions on Counts 10 and 11.[6]

### c. The Alleged Inconsistency Between the Indictment and the Jury Verdict

Related to Solorio's sufficiency arguments is his argument that the evidence adduced at trial was inconsistent with the terms of the indictment, necessitating reversal. We conclude that this claim is without merit as well.

The jury found Solorio guilty on Count 7 of conspiring to possess with intent to distribute 500 grams of cocaine. Solorio seems to argue that this is inconsistent with the indictment, because Count 7 of the indictment alleged that Solorio (as well as the other defendants) conspired to possess with intent to distribute 5 kilograms of cocaine. We interpret this claim as arguing either that a variance developed between

---

[6]Solorio makes the related argument that the district court erred in denying his Federal Rule of Criminal Procedure 33 motion for a new trial because the verdict was against the weight of the evidence. We review the district court's decision on this ground for an abuse of discretion. *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997), *cert. denied*, 525 U.S. 810 (1998). In evaluating a Rule 33 motion based on the weight of the evidence, unlike a sufficiency claim, "the trial judge can consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. It has often been said that he/she sits as a thirteenth juror." *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988) (quotation omitted).

For the reasons explained immediately above, the evidence against Solorio was certainly adequate, especially given the wide discretion given to the district court judge. *See id*. ("The court of appeals, however, *does not* sit as a 'thirteenth juror' to judge the credibility of witnesses . . . . Rather, we are limited to examining the evidence produced at trial to determine whether the district court's determination that the evidence does not 'preponderate heavily against the verdict' is a clear and manifest abuse of discretion.") (citation omitted).

the indictment and the facts adduced at trial or that the indictment was constructively amended.[7]

"This court reviews de novo the determination as to whether there has been an amendment to, or variance from, an indictment." *United States v. Smith*, 320 F.3d 647, 656 (6th Cir.) (emphasis removed), *cert. denied*, 123 S. Ct. 1954 (2003). There is a difference between these two terms. "A *variance* [to the indictment] occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment. In contrast, an *amendment* involves a change, whether literal or in effect, in the terms of the indictment." *United States v. Chilingirian*, 280 F.3d 704, 711 (6th Cir. 2002) (quotations omitted). "This Circuit has held that a variance rises to the level of a constructive amendment when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *Id.* at 712 (quotation omitted).

Although the distinction between a variance and a constructive amendment has been called "sketchy," we have noted that the "consequences of each are significantly different." *Id.* "A variance will not constitute reversible error

***

[7] The government argues that this issue was not raised in the district court and therefore should be reviewed for plain error. The government is correct when it points out that Solorio never specifically made an argument about an improper variance in his motion for acquittal. He did, however, state in that motion that since the jury found that Solorio did not conspire to distribute five kilograms, "the government failed to prove an essential element of Count 7 against Defendant Solorio." J.A. at 215. We hold that Solorio did adequately raise the variance issue, although we agree that this argument was awkwardly phrased both in the district court and on appeal.

unless 'substantial rights' of the defendant have been affected," while a constructive amendment is per se prejudicial. *Id.* (citation omitted); *see also United States v. Manning*, 142 F.3d 336, 339 (6th Cir. 1998) (stating that a substantial right of the defendant is violated by a variance "only when a defendant proves prejudice to his ability to defend himself or to the overall fairness of the trial").

Solorio can show neither a prejudicial variance nor a constructive amendment. The facts adduced at trial were not materially different from those alleged in the indictment. The concept of variance is designed to prevent the prosecution from convicting the defendant of a different offense, not a lesser variation on the charged offense. *See* Charles Alan Wright, 3 *Federal Practice & Procedure* § 516, at 25 (2d ed. 1982) (stating that "a defendant may be convicted of a lesser offense necessarily included in the offense with which he is charged" and noting that the principle of variance only prevents him from "be[ing] convicted of a different offense"). Solorio's complaint here is merely that he was convicted of a lesser-included offense, which is perfectly appropriate under Federal Rule of Criminal Procedure 31. *See* Fed. R. Crim. P. 31(c) (stating that "[a] defendant may be found guilty of any of the following: (1) an offense necessarily included in the offense charged"). Solorio therefore cannot show a *prejudicial* variance, because he cannot show that the variance affected his ability to defend himself. He similarly cannot show a constructive amendment to the indictment because he was not "convicted of an offense other than that charged in the indictment." *Chilingirian*, 280 F.3d at 712.

We considered a case materially identical to this one in a recent unpublished opinion. *United States v. Vazquez*, 49 Fed. Appx. 550, 2002 WL 31367162 (6th Cir. Oct. 18, 2002), *cert. denied*, 123 S. Ct. 1331 (2003). In *Vazquez*, "the indictment charged Vazquez and his co-defendants with a cocaine conspiracy that involved at least twelve kilograms of cocaine, which would have violated 21 U.S.C.

§ 841(b)(1)(A)." *Id.* at 552 (footnote omitted). The jury, however, "specifically found that Vazquez conspired to distribute more than five hundred grams but less than five kilograms of cocaine." *Id.* at 551. Since § 841(b)(1)(A) requires a conspiracy of five kilograms or more, Vazquez was convicted of a conspiracy under § 841(b)(1)(B).

We dismissed Vazquez's claim of a fatal variance or constructive amendment:

> Even if Vazquez can show a variance between the indictment and the proof at trial . . . we are not persuaded that it is substantially likely that Vazquez was convicted of an offense other than the one charged in the indictment. Vazquez was charged with a § 841(b)(1)(A) cocaine conspiracy and convicted of the lesser-included offense of a § 841(b)(1)(B) cocaine conspiracy. *See* Fed. R. Crim. P. 31(c). Because the essential elements of the former necessarily include those of the latter, we hold that the indictment was not constructively amended and affirm Vazquez's conviction.

*Id.* at 552-53. This case involves an identical fact pattern. The indictment charged Solorio with a conspiracy involving more than five kilograms under § 841(b)(1)(A). While the jury did not find Solorio had conspired with respect to five kilograms or more (which would have established a violation of § 841(b)(1)(A)), the jury did find that Solorio had conspired with respect to 500 grams or more, which made out the requirements of § 841(b)(1)(B). The jury merely convicted Solorio of a lesser-included offense, and as a result, his claims of prejudicial variance and constructive amendment are meritless.

## B. Sequestration Order

All four defendants raise the issue of whether the district court erred in failing to strike the testimony of McMurry and

Booker, after the court discovered that the two had conversed during a trial recess. Assuming that there was a violation of the relevant rule, we believe that the district court promptly and effectively remedied the violation, rendering total exclusion of McMurry's and Booker's testimony unnecessary. As a result, we reject the defendants' claims of error.

### 1. Facts Surrounding the Sequestration Order

McMurry and Booker were the key witnesses for the government against the four defendants. McMurry testified first, testifying on Wednesday, September 20, 2000, through Friday, September 22, 2000. Booker did not testify until Tuesday, September 26. On Saturday, September 23, the government found out that Booker and McMurry had a conversation about the case in a holding cell where they were both confined. The conversation took place on Thursday, September 21, during a trial break. The government brought the issue before the district court, and a hearing was held on this issue on Monday, September 25. Both Booker and McMurry testified.

According to both Booker and McMurry, the conversation was brief. Booker initiated the conversation by asking McMurry how his testimony was going, to which McMurry responded that the defense lawyers were "going to try to trip [Booker] up on some dates." J.A. at 1337 (Trial Test. of Booker). McMurry referred to one date in particular, "sometime in October when Carlos [Brittain] got pulled over." J.A. at 1348. Booker responded by saying that he did not remember any dates and that he would just admit to not remembering them. McMurry told Booker he was not impressed with the attorneys involved in the case and that defendant Dennis should have plea bargained. Booker also testified that McMurry mentioned something about six VIP tickets and six thousand dollars, though McMurry denied that

he said anything about the tickets or the money.[8]    Booker plainly stated that nothing that McMurry had said affected his testimony.

The district court found that there was a violation of Federal Rule of Evidence 615. However, the district court found that there was no evidence that the government had arranged (or even known about) the violation of Rule 615, and no evidence that any of the defendants had been prejudiced by this violation. The district court took three steps to remedy the violation. It foreclosed the government from asking Booker (who had not yet testified) about the stop of Carlos Brittain, the VIP tickets, or the $6,000. The district court allowed the parties to explore the sequestration violation fully in cross-examination, which they did. The district court also instructed the jury that they could consider the Rule 615 violation in making credibility determinations. Defense counsel also repeatedly pointed out the violation in closing argument, encouraging the jury to devalue Booker's and McMurry's testimony.

On appeal, all the defendants argue that the district court's remedies for the sequestration violation were insufficient, claiming that Booker should have been disqualified from

---

[8]Government agents intercepted a conversation between Dennis and McMurry where the two discussed the fact that Dennis owed $6,000 to McMurry and the fact that Dennis needed to return a number of "bad checks." J.A. at 785 (Trial Test. of McMurry). McMurry explained in court that the $6,000 was "drug money that [Dennis] owed me from the drugs that I fronted him." J.A. at 501 (Trial Test. of McMurry). Apparently, Dennis attempted to rebut McMurry's explanation of the conversation by suggesting that the $6,000 was not for drugs, but was for VIP tickets to a concert. Dennis claims that McMurry's statement to Booker about the VIP tickets and the $6,000 may have been McMurry's attempt to persuade Booker to testify that the $6,000 was owed for drugs and not VIP tickets, thereby corroborating McMurry's story and undermining Dennis's defense.

testifying and that the portion of McMurry's testimony that was subsequent to the violation should have been struck.

## 2. Sequestration Analysis

We review the district court's decision regarding sequestration of witnesses for an abuse of discretion. *United States v. Gibson*, 675 F.2d 825, 835 (6th Cir.), *cert. denied*, 459 U.S. 972 (1982).

Federal Rule of Evidence 615 states that "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses." Fed. R. Evid. 615. This rule codifies, to an extent, the sequestration powers of the trial judge at common law; we have stated that its purpose is to prevent "the influencing of a witness' testimony by another witness." *United States v. Rugiero*, 20 F.3d 1387, 1392 (6th Cir.) (citing *Gibson*, 675 F.2d at 835), *cert. denied*, 513 U.S. 878 (1994). However, while the purpose of the rule is apparent; its purview is not. Circuits have split on the question of whether "the scope of Rule 615 extends beyond the courtroom to permit the court to preclude out-of-court communication between witnesses about the case during trial." Charles Alan Wright & Victor James Gold, 29 *Federal Practice & Procedure* § 6243, at 61 (1997); *compare United States v. Sepulveda*, 15 F.3d 1161, 1176 (1st Cir. 1993) (stating that Rule 615 authorizes a trial court to "'order witnesses excluded' only from the courtroom proper") (citation omitted), *cert. denied*, 512 U.S. 1223 (1994), *with United States v. Prichard*, 781 F.2d 179, 183 (10th Cir. 1986) (stating that a "sequestration order pursuant to Fed. R. Evid. 615 requires not only that witnesses be excluded from the courtroom, but that witnesses also refrain from discussing their testimony outside the courtroom"). This court once suggested in dicta that the rule's ambit extends beyond the courtroom. *See Rugiero*, 20 F.3d at 1394 ("[W]e think it unnecessary, once the rule is invoked, that either party need ask the court to instruct each witness not to discuss his

testimony with another witness yet to testify."). This court in *Rugiero* did not, however, resolve the issue; we assumed that there was a violation of the rule but concluded that in any event the violation was not prejudicial. *Id.* ("But even if we count this as a violation . . . we find no prejudicial error in the district court's rulings.").

As in *Rugiero*, we feel no need to decide the delicate issue of whether Rule 615 extends beyond the courtroom. Assuming that Rule 615 extends to cover this situation and that it was violated by the witnesses in this case, we hold that district court's remedy to the alleged violation was appropriately fashioned and well within her discretion.[9] It is well settled in this circuit that a "'violation of an order directing that witnesses be separated does not automatically bar a witness' testimony.'" *Id.* (citation omitted). Instead:

> If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground merely, although the right to exclude under particular circumstances may be supported as within the sound discretion of the trial court.

---

[9] Of course, even if Rule 615 only applies to in-court communications between witnesses, trial courts still would "retain[] discretion to preclude such out-of-court communications between witnesses as a function of the court's general powers to manage the conduct of the trial." Charles Alan Wright & Victor James Gold, 29 *Federal Practice & Procedure* § 6243, at 62 (1997). Such orders are "generally thought to be a standard concomitant of basic sequestration fare, serving to fortify the protections offered by Rule 615," *United States v. Sepulveda*, 15 F.3d 1161, 1176 (1st Cir. 1993), *cert. denied*, 512 U.S. 1223 (1994), and we mean to cast no aspersions on their use.

In the case at bar, no independent sequestration order was issued, so our only concern here is the protections afforded by Rule 615.

*Gibson*, 675 F.2d at 836 (quoting *Holder v. United States*, 150 U.S. 91, 912 (1893)); *see also* Charles Alan Wright & Victor James Gold, 29 *Federal Practice & Procedure* § 6246, at 93-95 (1997) (explaining that the district judge has many options when faced with a violation of Rule 615, including holding the witness in contempt, holding the counsel who is responsible for the violation in contempt, allowing the witness to be cross-examined, explaining the significance of the violation to the jury, declaring a mistrial, striking the witness's testimony in part, and disqualifying the witness from testifying entirely). As *Gibson* notes, we only permit exclusion in "particular circumstances," such as where a "witness has remained in court with the 'consent, connivance, procurement, or knowledge' of the party seeking his testimony." *Gibson*, 675 F.2d at 836 (citation omitted) (holding it was not an abuse of discretion for the district court to bar a party's witness from testifying after the witness had remained in open court with the party's knowledge in violation of a sequestration order). Exclusion is considered a very severe remedy. *See* John W. Strong, *McCormick on Evidence* § 50, at 210 (5th ed. 1999) ("The courts are markedly reluctant to resort to the drastic remedy of disqualifying the witness."); Charles Alan Wright & Victor James Gold, 29 *Federal Practice & Procedure* § 6246, at 95 (1997) (calling it a "drastic remed[y] that impose[s] significant hardship on a party that loses the testimony of a key witness").[10] Moreover, in order for a party to receive a new trial based on a district court's failure to exclude testimony, we have also held that the party must show that the error prejudiced its right to a fair trial. *Rugiero*, 20 F.3d at

---

[10] Given the rare circumstances under which this remedy is justified as well as the district court's discretion not to impose it, the authors of Federal Practice and Procedure "have found no federal appeals court decision holding that the failure to disqualify a witness after violation of an exclusion order is an abuse of discretion." Charles Alan Wright & Victor James Gold, 29 *Federal Practice & Procedure* § 6246, at 96 n.22 (1997).

1394 (holding that it was not an abuse of discretion for a district court to permit a witness's testimony even after the witness had violated the sequestration order with the knowledge of the witness's party because the error was not prejudicial).

We conclude that the defendants have not shown that exclusion was necessary in this case. First, the defendants do not even argue that the prosecution had any knowledge of the clandestine meeting between McMurry and Booker. Our decision in *Gibson* suggests that exclusion of a witness is only justified when the party seeking the testimony knowingly violates the sequestration order. Both *Gibson* and *Rugiero* involved parties that knew of their witness's sequestration violation at the time it took place. *Rugiero*, in fact, upheld a district court's order not to exclude the witness because of a lack of prejudice, though it called the issue "a close one." *Id.* Here, none of the defendants even argue that the prosecution knew about the violation of the sequestration order at the time of its occurrence.

Even if exclusion could be an appropriate remedy in a case like this one — where the sequestration rule was violated without the knowledge of the party seeking to use the testimony of the sequestered witness — the measures taken by the district judge eliminated any prejudice the defendants could have possibly faced as a result of the violation.

McMurry made two statements to Booker that potentially could have influenced his testimony. First, McMurry mentioned that he was quizzed about dates. Only one date in particular was mentioned and that was the date that Carlos Brittain was stopped by police. In response, the district court prevented the government from asking Booker about

Brittain's stop.[11]     Second, McMurry may have stated something about VIP tickets and six thousand dollars. In response, the district court prevented the government from inquiring into this subject with Booker. These limitations prevented Booker's testimony from being tainted by Booker's and McMurry's conversation. Additionally, the district court gave a specific instruction to the jury regarding the violation of the Rule, and allowed the defense counsel to raise the violation in their cross-examinations of Booker and in their closing arguments. These sensible and well-tailored steps not only prevented the defendants from being prejudiced, but also did not unduly interfere with the government's case. As a result of these careful measures, the defendants are now unable to show that the district court's failure to exclude the witnesses was prejudicial. *See Rugiero*, 20 F.3d at 1394 (requiring prejudice before exclusion could be ordered); Charles Alan Wright & Victor James Gold, 29 *Federal Practice & Procedure* § 6246, at 91-92 (1997) (stating that "[v]iolation of an exclusion order is prejudicial if the witness who violated that order subsequently gave important testimony that was influenced by the testimony of other witnesses"). There is no evidence that any significant aspect of Booker's testimony was influenced by McMurry's

---

[11]Juarez argues that even McMurry's and Booker's general discussion about dates prejudiced his defense. Juarez argues that McMurry lied when he stated on the stand that there were cocaine deals after May of 1998, and claims that McMurry discussed dates with Booker to get him to corroborate McMurry's lie.

Juarez's claim is pure speculation. Not only is there no evidence that McMurry lied on the stand, there also is no evidence that McMurry and Booker discussed the date when the cocaine deals ceased or referred to the May 1998 date. McMurry told Booker that the defendants' lawyers were going to try to trip Booker up on dates; Booker then stated that he did not remember any dates and that he would just admit to failing to remember them. Other than discussing the date of the stop of Carlos Brittain, there was no discussion of particular dates or events that occurred on those dates. Juarez's claim that he was prejudiced by the discussion of dates is therefore not at all persuasive.

previous testimony. We therefore dismiss this contention of error.

## C. Juror Misconduct

Luna and Solorio raise the issue of whether the district court erred in not granting a new trial based on the fact that a juror had not explained during voir dire his relationship with one of the government's witnesses. Because Luna and Solorio have not shown deliberate concealment or actual bias on the part of the juror, their claim fails.

### 1. Factual Background

On September 22, 2000, during the fourth day of trial, juror James Fox submitted a note to the judge. The note explained that Fox had worked with government witness Donna Webber at Opryland. Fox was called into court. He stated that he worked with Webber at Opryland from 1982 to 1989, in food service. Initially, the district judge believed that Fox should be disqualified, but the government suggested that Fox could still be a fair juror. The court then interrogated Fox on the nature of his relationship with Webber. Fox stated that they were merely coworkers and not friends, never socializing with each other outside of work. Fox had no opinion as to Webber's truthfulness and stated that his previous relationship with her would not affect his evaluation of her testimony or make him more or less likely to believe the government's representation of the facts.

Counsel for Juarez objected, stating that had he known about the relationship between Fox and Webber, he would have exercised his peremptories differently. Counsel for Solorio and Luna also objected.

### 2. Legal Analysis

"'[A] district court's determination on a motion for either a new trial or relief from judgment because a juror failed to fully disclose information during *voir dire* is reversible only for either an abuse of discretion . . . or a clear error of law in the exercise of this discretion.'" *Zerka v. Green*, 49 F.3d 1181, 1184 (6th Cir. 1995) (citation omitted).

There are two ways in which a party seeking a new trial based on a juror's concealment of information can obtain a new trial. First, if a juror deliberately conceals material information on voir dire, the party seeking a new trial can obtain relief by showing that the juror could have been challenged for cause. *See Zerka*, 49 F.3d at 1185 ("'We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.'") (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555-56 (1984)) (emphases removed). In such a case, "bias may [but need not] be inferred." *Zerka*, 49 F.3d at 1186 (emphasis removed).

It is possible, however, that a juror could have concealed information in a non-deliberate fashion, through an "honest, though mistaken, response." *Id.* at 1186 n.7. If information is not deliberately concealed, bias may not be inferred. Instead, "the movant must show actual bias" in order to obtain a new trial. *Id.* at 1186 (emphasis removed).[12]

---

[12]Some circuits have held that a showing of deliberate concealment is necessary for relief under *McDonough*. *See Fitzgerald v. Greene*, 150 F.3d 357, 364 n.3 (4th Cir.) (listing cases), *cert. denied*, 525 U.S. 956 (1998). As *Fitzgerald* reports, however, we rejected that position in *Zerka*, when we held that "*McDonough* does not entirely foreclose a party from seeking a new trial on the basis of a prospective juror's honest, though mistaken response." *Zerka v. Green*, 49 F.3d 1181, 1186 n.7 (6th

Luna and Solorio have not shown that they are entitled to relief under either of these prongs. First, there has been no showing of deliberate concealment. We find it eminently plausible that James Fox only remembered having met Donna Webber when she appeared on the stand and began testifying. The defendants have pointed to nothing (such as one of Fox's answers to a question asked in voir dire) that contradicts this point, which is also supported by the fact that Fox went directly to the judge after hearing Webber's testimony.

Second, there has been no showing that Fox was actually biased. Fox was repeatedly asked whether his relationship with Webber would have any effect on his perception of her testimony. He repeatedly and unambiguously answered that it would not. We find this conclusion particularly reasonable in light of the fact that Fox and Webber's relationship was limited in scope and had ended over a decade before the trial commenced.[13]

### D.  *Apprendi* **Violations**

Juarez, Luna, and Solorio claim that the district judge used, for sentencing purposes, a drug quantity not found by the jury, thereby violating principles laid out in the Supreme

---

Cir. 1995).

[13]The defendants' argument that they may have exercised their peremptory challenges against Fox if they had known about his connection with Webber is unavailing. A showing that the juror deliberately concealed information and could have been challenged for cause (or, alternatively, that the juror was actually biased) must be made. *See Zerka*, 49 F.3d at 1185 ("'[I]t ill serves the important end of finality to wipe the slate clean to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination.'") (emphasis removed) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984)).

Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). As we conclude that their sentences were all within the prescribed statutory maximums, however, we reject their challenges.

Count 7 charged Juarez, Luna, and Solorio with conspiring to possess with intent to distribute five kilograms or more of cocaine. The jury found Juarez and Luna guilty under Count 7 with a quantity of cocaine that was five kilograms or more. The jury found Solorio guilty under Count 7, but found that the cocaine involved was less than five kilograms, but was 500 grams or more. Juarez and Luna were sentenced pursuant to 21 U.S.C. § 841(b)(1)(A), which applies to convictions involving quantities of cocaine of five kilograms or more and provides a statutory sentencing range of ten years to life in prison. Juarez received a sentence of 292 months, and Luna received a sentence of 235 months. Solorio was sentenced pursuant to 21 U.S.C. § 841(b)(1)(B), which applies to convictions involving cocaine quantities of 500 grams or more and provides a statutory range of five to forty years of imprisonment. Solorio received a sentence of 210 months.

The defendants allege that *Apprendi* was violated by the district court when, in determining base offense levels under the Guidelines, it held the defendants responsible for a higher quantity of drugs than determined by the jury. The district judge determined Juarez and Luna's base levels after finding 150 kilograms of cocaine. The district judge determined Solorio's base level after finding forty-three kilograms of cocaine.

The defendants' *Apprendi* claims have no merit. The mere fact that the district judge computed the defendants' sentences under the Guidelines using a different quantity of drugs than the jury found is irrelevant under *Apprendi* as long as the resultant sentence is still below the prescribed statutory maximum for the quantity of drugs actually found by the jury. *See United States v. Lawrence*, 308 F.3d 623, 634 (6th Cir.

2002) ("*Apprendi* by its terms applies only where the finding 'increases the penalty for a crime beyond the prescribed *statutory* maximum,' and we have squarely held that *Apprendi* does not apply to the Guidelines.") (citation omitted); *United States v. Garcia,* 252 F.3d 838, 843 (6th Cir. 2001) ("*Apprendi* does not purport to apply to penalties in excess of any particular range or based on any particular offense level under the Sentencing Guidelines."). Because Juarez's and Luna's sentences were below the life-sentence ceiling of 21 U.S.C. § 841(b)(1)(A) and because the jury found that Juarez and Luna had both conspired to possess with intent to distribute more than five kilograms as required by 21 U.S.C. § 841(b)(1)(A), their *Apprendi* claims fail. Similarly, because Solorio's sentence was within the statutory range of five to forty years under 21 U.S.C. § 841(b)(1)(B) and because the jury found that Solorio conspired to possess with intent to distribute 500 grams of cocaine or more as was necessary for a conviction under 21 U.S.C. § 841(b)(1)(B), his *Apprendi* claim also fails.[14]

---

[14] The facts surrounding Solorio's conviction are slightly different than the facts surrounding Juarez's and Luna's. In Solorio's case, the jury found that Solorio had conspired to possess with intent to distribute 500 grams or more, but did not find that Solorio had conspired with respect to 5 kilograms or more of cocaine. The district judge, however, determined Solorio's sentence under the Guidelines using 43 kilograms, which according to Solorio, contravenes the jury's "finding" that less than five kilograms were involved. This, however, does not change our *Apprendi* analysis, for it does not change the fact that Solorio's sentence was within the statutory range under 21 U.S.C. § 841(b)(1)(B), applicable to defendants that conspire to possess with intent to distribute 500 grams or more of cocaine.

Any appearance of inconsistency between the district judge's and the jury's findings is obviated when one considers the differing standards of proof in the two contexts. It is entirely plausible that a district judge could find one drug quantity made out by a preponderance of the evidence even though the jury found a lesser quantity proved beyond a reasonable doubt. *See United States v. Watts*, 519 U.S. 148, 157 (1997) (holding "that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that

## E.  Rule 32 Violation

In conjunction with his *Apprendi* claim, Luna argues that even if he was not sentenced in violation of *Apprendi*, the district court erred to failing to make drug quantity findings as required by former Federal Rule of Criminal Procedure 32(c)(1), now Rule 32(i)(3)(B). The rule now states that "for any disputed portion of the presentence report or other controverted matter" that arises at sentencing, the court must "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B).[15]  We explained the former

---

conduct has been proved by a preponderance of the evidence").

[15] The former rule, literally read, required courts to "rule on *any* unresolved objections to the presentence report." *See* Fed. R. Crim. P. 32(c)(1) (2001) (emphasis added). According to the Advisory Committee, the text of the rule left it unclear "whether that provision should be read literally to mean every objection that might have been made to the report or only on those objections that might in some way actually affect the sentence." Fed. R. Crim. P. 32, advisory committee's note (2002). The broader reading of the rule, the committee feared, "might place an unreasonable burden on the court without providing any real benefit to the sentencing process." *Id.* To ameliorate this concern, the rule was revised to "narrow[] the requirement for court findings to those instances when the objection addresses a 'controverted matter.'" *Id.*

We, however, had not adopted the broad view of the rule that the rule has been amended to prevent. Even before the rule change, we had held that a district court's failure to address a controverted matter under Rule 32(c)(1) did not warrant reversal as long as the controverted matter did not affect the defendant's sentence. *See United States v. Parrott*, 148 F.3d 629, 634 (6th Cir. 1998) (explaining that such errors must be considered harmless under Fed. R. Crim. P. 52(a)). We had also held that the defendant had a duty to controvert expressly a matter in the district court before Rule 32 would apply. *See United States v. Hurst*, 228 F.3d 751, 760 (6th Cir. 2000) (holding that because the defendant "did not expressly call [these matters] to the court's attention during the sentencing hearing, it can hardly be said that these matters were sufficiently 'controverted' to trigger the sentencing court's fact-finding duty under Rule 32(c)(1)").

version of the rule as requiring that "a court may not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence." *United States v. Tarwater*, 308 F.3d 494, 518 (6th Cir. 2002).

Luna claims that the district judge did not make a determination, for sentencing purposes, of the quantity of drugs for which Luna was responsible. This claim is meritless. At Luna's sentencing hearing, the district judge stated that the government was "maintaining that . . . the conspiracy was between 200 and 400 kilograms." J.A. at 2378. The district judge determined that once the drug quantity reached 150 kilograms (which it did in this case), the total offense would be 38, because "[t]hat's the highest it can be." J.A. at 2378. The district court correctly found that a further quantity determination was unnecessary because the base offense level "would be the same whether it's 150 kilograms or 900 kilograms or whatever." J.A. at 2378; *see also* United States Sentencing Commission Guidelines Manual ("U.S.S.G.") § 2D1.1(C)(1), at 112 (2001) (reporting that for "150 KG or more of Cocaine" the base offense level is 38). The district court therefore properly resolved all material factual disputes. Luna's contention to the contrary is meritless.[16]

---

[16] We cannot help but noting that Luna's claim also fails because it was not properly raised. As we held in the *Hurst* case (and as the recent amendment to Rule 32 was meant to insure), a criminal defendant has a duty to tell the district judge that matters are controverted. Luna never raised this matter in front of the district judge. Luna's counsel was asked, "Are there any other issues in dispute, Mr. Drake, that I didn't already rule on?" He answered, "No, your Honor." J.A. at 2379.

## F. Firearm Enhancement

Next we address Juarez's claim that the district court erred in increasing his base offense level by two levels pursuant to U.S.S.G. § 2D1.1(b)(1) for possessing a firearm.

### 1. Relevant Factual Development

Early in the morning of March 18, 1999, Juarez drove away from his apartment, located at 710 Saxony Drive, in a white pickup truck. Inside of the pickup was forty pounds of marijuana. Juarez helped Hearn to unload the marijuana at Hearn's residence. Juarez was stopped and arrested while he was leaving. Subsequent to his arrest, the police searched Juarez's apartment pursuant to a valid search warrant. In the apartment, they found two 9-mm Glock handguns. The guns were located at the bottom of a pair of boots, which were on top of a little black bag. Inside the bag were a variety of drug trafficking tools: a money counter, drug ledgers, paper money wrappers, and rubber bands. Boxes for the firearms were later found at Luna's house.

At the time of Juarez's arrest, his apartment was in disarray. The food in the refrigerator was rotten, and the electricity was turned off. Juarez claims that he was not living in the apartment at the time of the arrest in March but admits that he and his wife had lived there the previous summer and that his name was on the lease.

### 2. Legal Analysis

"A district court's finding that a defendant possessed a firearm during a drug crime is a factual finding subject to the clearly erroneous standard of review." *United States v. Bartholomew*, 310 F.3d 912, 924 (6th Cir. 2002), *cert. denied*, 123 S. Ct. 1005 (2003). Enhancement analysis under § 2D1.1(b)(1) has two parts. First, the government has the initial burden of showing "by a preponderance of the evidence

that the defendant possessed the firearm" for purposes of § 2D1.1(b)(1). *United States v. Miggins*, 302 F.3d 384, 390-91 (6th Cir. 2002), *cert. denied*, 123 S. Ct. 712, 909, 1772 (2002-03). Possession may be actual or constructive. "To establish constructive possession, the government must show that the defendant had ownership, dominion, or control over the [firearm] or dominion over the premises where the [firearm] is located." *Id.* (quotations omitted). "[T]he burden [then] shifts to the defendant to demonstrate that it was clearly improbable that the weapon was connected to the offense." *Id.* Only if the defendant can make this showing does the enhancement not apply.

The government met its burden of showing constructive possession. Juarez leased the apartment where the guns were found and had left them in the apartment on the morning of March 18, 1999, the morning he was arrested. It therefore falls to Juarez to prove that it was clearly improbable that the weapon was connected to the offense. Juarez has not shown this to be the case. The firearms, two 9-mm handguns, are weapons "often used in drug trafficking." *United States v. Jernigan*, Nos. 01-2121/2304, 2003 WL 463483, at *4 (6th Cir. Feb. 18, 2003). Moreover, the firearms were found in a pair of boots on top of a bag full of other objects related to drug trafficking, including a money counter, drug ledgers, paper money wrappers, and rubber bands. When Juarez was arrested on March 18, 1999, he had just smuggled forty pounds of marijuana, apparently from the apartment. The district court found "evidence of drug activity in that apartment both before and after the guns were brought there." J.A. at 2454. Juarez has not therefore shown that it was clearly improbable that the weapon was connected to the offense. *See Keszthelyi*, 308 F.3d at 579 (affirming the enhancement of a defendant's sentence when drugs were found in the residence and firearms were found in the defendant's bedroom, including a shotgun found in a closet containing cash from the drug transactions); *United States v. Hill*, 79 F.3d 1477, 1486 (6th Cir.), *cert. denied*, 519 U.S. 858

(1996) (affirming the enhancement of a defendant's sentence when the guns were found in a "residence to which [defendant] had full access and where drugs were found"). Juarez's argument that Luna was the one who owed the guns is irrelevant. *See United States v. Saikaly*, 207 F.3d 363, 368 (6th Cir. 2000) ("Saikaly also seems to rely on the fact that he did not own the firearms. This is irrelevant. The issue is not ownership, but possession of the firearms."). The district court did not clearly err in applying this enhancement.

## G. Supervisory Role Increase

We next turn to Solorio's claim that the district court erred in increasing his base offense level by three points for his leadership role in the drug conspiracy. We conclude that the district court did not err in making this determination, and therefore uphold the supervisory role increase.

We note at the outset that it is unclear what standard of review we employ with regard to a district court's enhancement decision under § 3B1.1. A few years ago it was clear that we reviewed a district court's factual findings for clear error and legal conclusions de novo. *See, e.g., United States v. Taylor*, 248 F.3d 506, 515 (6th Cir.), *cert. denied*, 534 U.S. 981 (2001). The Supreme Court's decision in *Buford v. United States*, 532 U.S. 59 (2001), however, has suggested that deference may be appropriate when we review a district court's application of the Guidelines, especially when it involves fact-bound determinations, issues that district courts may have comparatively greater expertise in addressing, or situations in which there will be limited value to uniform court of appeals precedent. In *United States v. Dupree*, 323 F.3d 480 (6th Cir. 2003), this court noted that the impact of *Buford* on supervisory enhancements had not been resolved, stating that "standard of review for enhancements under § 3B1.1 is now open to question." *Id.* at

494. The *Dupree* court apparently did not resolve this thorny question.[17]

We do not need to resolve the *Buford* question here, for we would affirm the district court's application of the enhancement regardless of the standard of review. To begin the analysis, Guideline § 3B1.1(b) provides that a court should increase a defendant's base offense level by three levels, "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." *See* U.S.S.G. § 3B1.1(b) (2001). The government bears the burden of proving that the enhancement applies. *Dupree*, 323 F.3d at 491.

In considering whether a defendant was a manager or supervisor, we consider such factors as "'the defendant's exercise of decision-making authority, any recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning the offense, and the degree of control the defendant exercised over others.'" *Id.* Under this standard, we believe that Solorio

---

[17] After looking closely at *Dupree*, we are of the opinion that the *Dupree* court did not resolve the *Buford* issue. The *Dupree* court noted that we had (in an unpublished opinion) suggested that *Buford* may mean that § 3B1.1 enhancements should be reviewed under a more deferential standard of review. The *Dupree* court did not resolve this conflict, but concluded by stating that "[g]iven this court's recent reference to a more deferential standard of review, we uphold the enhancement based on the district court's findings." *United States v. Dupree*, 323 F.3d 480, 494 (6th Cir. 2003).

Although this language could be taken to read that the *Buford* deferential standard of review is now the law for § 3B1.1 applications, we believe that the *Dupree* court did not decide this issue. The court never stated that *Buford* either did or did not apply to this factual situation, and *Dupree* contains no legal analysis of the issue. Under these circumstances we do not believe that we have taken a clear position on the applicability of *Buford* to review of § 3B1.1 enhancements.

should be considered a supervisor. As the government notes, there is uncontroverted evidence that Solorio recruited Moises Picos-Picos as an accomplice and exercised control over him. Solorio arranged for Picos-Picos to come from Tijuana to help Solorio and leased an apartment for him. In return, Picos-Picos worked for Solorio, delivering bags of cocaine and money, and keeping records of drug transactions for Solorio. Solorio planned and directed all of Picos-Picos's drug activities. This is sufficient to establish that Solorio was a supervisor within the meaning of the Guideline. *See Dupree*, 323 F.3d at 494 (upholding the enhancement for a robber who supplied the gun, provided information about the victimized store and armored truck service, and moved surveillance cameras).

Solorio's only argument against the enhancement is that the "Picos-Peraza matter was separate from any dealing with Omar Rocha and the conspirators related to Mr. Rocha." Solorio Br. at 24. Solorio therefore argues that an enhancement under § 3B1.1(b) was inappropriate because it requires a showing that the enterprise had "five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Solorio argues, in effect, that the jury's verdict holding that he conspired only with respect to 500 grams of cocaine proves that he did not belong to the larger conspiracy. It supposedly demonstrates that the jury believed that there was a subconspiracy between himself and Picos-Picos. This conspiracy, Solorio alleges, is not "extensive" within the meaning of the Guideline and does not involve five people — thereby preventing Solorio from receiving the enhancement.

We do not find this argument persuasive. The district court at sentencing explicitly found that Solorio was part of the larger conspiracy. Even if the jury had found that Solorio was only part of a conspiracy between himself and Picos-Picos, the differences in the standards of proof at the guilt and sentencing phases resolve any seeming inconsistency. As a result, even if the jury verdict were construed as finding that

Solorio did not belong to the larger conspiracy beyond a reasonable doubt, the district judge still could have found by a preponderance that Solorio did belong to the larger conspiracy. *See United States v. Watts*, 519 U.S. 148, 157 (1997) (explaining "that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"). We therefore affirm the district court's decision to apply the supervisory enhancement.

## H.  Mitigating Role Reduction

Solorio claims that the district court erred in denying him a mitigating-role reduction pursuant to U.S.S.G. § 3B1.2 for having a small role in the conspiracy. This claim is easily resolved against Solorio.

"Whether a defendant is entitled to a downward [adjustment] under § 3B1.2 depends heavily on factual determinations, which we review only for clear error." *United States v. Campbell*, 279 F.3d 392, 396 (6th Cir. 2002). Solorio has the burden of proving, by a preponderance of the evidence, that he is entitled to the reduction. *United States v. Bartholomew*, 310 F.3d 912, 924 (6th Cir. 2002). Under § 3B1.2, a defendant can receive a four-level reduction for being a minimal participant or a two-level reduction for being a minor participant. "A minimal participant is one who is 'plainly among the least culpable of those involved in the conduct of a group,' and a minor participant is one who 'is less culpable than most other participants, but whose role could not be described as minimal.'" *Id.* (quoting U.S.S.G. § 3B1.2, cmt. nn. 1, 3).

Solorio here was not less culpable than most of the other participants in the conspiracy. All the reasons that supported the district court's finding that Solorio was a supervisor justify the denial of Solorio's request for a mitigating-role

reduction. There is no doubt that Solorio was intimately connected with the drug conspiracy. His own records indicate that he distributed extensive amounts of cocaine and marijuana. To the extent that Solorio did not distribute the drugs himself, he was directing his associate Picos-Picos to do so in his stead. Picos-Picos delivered large quantities of drugs for Solorio and received cash payments for him as well. The control he exerted over Picos-Picos clearly reflects that Solorio was no minor participant in this conspiracy. We can see no error in the district court's denial of the mitigating-role reduction.

## I.  Downward Departure

We now turn to the defendants' last claim of error. Juarez and Solorio both argue that the district court erred by refusing to depart downward from their sentences under the Guidelines. Juarez argues that he should have been given a downward departure on the basis of harsh conditions of confinement. Solorio argues he should have been given a downward departure based on his status as a deportable person.

We have held that "a district court's discretionary refusal to depart downward is generally not appealable, unless the district court mistakenly believed it did not have legal authority to depart downward." *United States v. Pruitt*, 156 F.3d 638, 650 (6th Cir. 1998), *cert. denied*, 525 U.S. 1091 (1999). The defendant has the burden to show that the district court believed it lacked authority to depart downward. *See United States v. Cook*, 238 F.3d 786, 791 (6th Cir.) (stating that "where explicit mention is not made of the court's power to depart downwards, 'it should be assumed that the court in the exercise of its discretion found downward departure unwarranted'") (citation omitted), *cert. denied*, 534 U.S. 876 (2001).

In both Juarez's and Solorio's cases, the district judge stated that she did not find a departure to be authorized, but that even if it were, she would exercise her discretion not to depart. It appears that we have never squarely addressed in a published opinion whether a district judge's refusal to grant a departure is reviewable when it is clear *both* that the judge believes that she has no authority to depart *and* that she would not depart even if she had the authority — although this phrasing seems to be a common practice in district courts. *See United States v. Hill*, No. 89-5952/5954/5957, 1991 WL 63621, at *3 (6th Cir. Apr. 23, 1991) (holding unappealable a refusal to depart when the judge made an apparently ambiguous remark indicating that he would not depart even if he were authorized to do so); *see also United States v. Norfleet*, No. 98-1311, 1999 WL 1281718, at *2-*3 (6th Cir. Dec. 28, 1999), *cert. denied*, 529 U.S. 1135 (2000); *United States v. Coleman*, No. 98-1861, 2000 WL 1872015, at *1 (6th Cir. Dec. 14, 2000).

If there was any doubt about the issue, we dispel it today by holding the district judge's refusal to depart here to be unreviewable. This accords with the practice of the federal circuits that have considered the question. *United States v. DeLeon*, 187 F.3d 60, 69 (1st Cir.), *cert. denied*, 528 U.S. 1030 (1999); *United States v. Williams*, 898 F.2d 1400, 1403 (9th Cir. 1990); *see also* Charles Alan Wright et al., 15B *Federal Practice & Procedure* § 3918.8, at 585 (2d ed. 1992) ("If the district court both concludes that there is no authority to make a downward departure and that in any event there is no basis for making a departure, the alternative discretionary refusal to depart has been held sufficient to support the sentence and to defeat review."). Given the "strong presumption that a district court's denial of a downward departure is based on an exercise of discretion," *Cook*, 238 F.3d at 791, and the useless formality of a remand to a judge who has already stated that she would not exercise her discretion to depart, we conclude that the decision not to

depart in this case is unreviewable. We accordingly dismiss Juarez's and Solorio's allegations of error.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision in all respects.